ALEXANDRIA AMUSEMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17249.  Promulgated February 26, 1951.

*Robert Ash, Esq.*, and *John Y. Merrell, Esq.*, for the petitioner.
*George J. LeBlanc, Esq.*, and *Irene F. Scott, Esq.*, for the respondent.

450

OPINION.

VAN FOSSAN, *Judge:* The question in this case is whether petitioner is entitled to any relief under section 722 (b) (4) or (b) (5) of the Internal Revenue Code.[1]

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and dis-

The petitioner corporation was organized in 1929. Its business then consisted of the operation of two small and rather obsolete theatres in Alexandria, Virginia. In 1937 it opened a third theatre, the Reed, in Alexandria. This new theatre almost doubled the combined seating capacity of petitioner's theatres.

The petitioner contends that the opening of the Reed on April 5, 1937, constituted a change in the capacity of the business during the base period such as to entitle it to relief under the provisions of section 722 (b) (4). The respondent concedes that the opening of the third theatre is "such a factor as is contemplated in section 722 (b) (4)."

The taxpayer having thus established that the tax computed without the benefit of section 722 results in an excess and discriminatory tax, must reconstruct what would be a fair and just amount representing normal earnings to be used in computing the excess profits tax. The push-back rule of section 722 (b) (4) applies where the petitioner has not reached "by the end of the base period, the earning level which it would have reached if [it] had commenced business or made the change in the character of the business two years before it did so, * * *." If it has not, then the petitioner "shall be deemed to have commenced the business or made the change at such earlier time" and entitled to reconstruct its base period income accordingly.

The purpose of the push-back rule is to determine an earnings level at the *end* of the base period. (Bulletin on Section 722 (1944), page 68). The petitioner, in arguing for the benefits of the push-back rule,

criminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term 'change in the character of the business' includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business; or

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

contends that its base period earnings are not normal because its third theatre had not developed sufficiently by the end of 1939 so that the year 1939 represented a normal year of earnings. The petitioner offered the testimony of one of its officers and two accountants to the effect that it took longer than the end of 1939 for the earnings to reach a normal level. This theory was first advanced at the hearing. Prior thereto, in its application for relief, the petitioner's answer was "Yes" to the following question:

> Did the business reach, by the end of the base period, the earning level it would have reached if the * * * change in the character of the business had occurred 2 years prior to the time the * * * change occurred?

It cannot now advance a different theory. *Blum Folding Paper Box Co.*, 4 T. C. 795. Moreover, there is no merit in petitioner's theory if the same could be urged.

Looking next to petitioner's reconstruction of net income as set forth in our Findings of Fact, it is apparent that the first adjustment was to include what would have been earned had the theatres been open on Sunday during the base period. This adjustment we can eliminate inasmuch as it takes into consideration conditions existing after December 31, 1939. Petitioner argues this point under section 722 (b) (5) and we discuss it below. It is sufficient to say here that a reconstruction of income based on other than petitioner's business hours during the base period is not warranted. Petitioner's next adjustment is to apply to the income as adjusted by Sunday operations, an adjustment for a growth formula. This is also incorrect in that we are assuming, as did the petitioner, that 1939 was normal and are reconstructing from the base here. We must also assume, as did the petitioner in its reconstruction, that the growth arising out of the change in the character of the business was complete by the end of 1939. Proceeding with the assumption that 1939 was a normal year and using petitioner's method of correlating income to population, we divide the "normal" income for 1939 by the population for that year and get a yield of $1.1734 of earnings per capita (as opposed to petitioner's earnings of $1.7542 per capita based on what would have been earned had Sunday operation been permitted). Multiplying this figure of earnings per capita by the population in each year we get an average base period net income of $36,865.14 as follows:

| Year | Average population | Movie earnings per capita | Constructive net income for year |
|------|-------------------|--------------------------|----------------------------------|
| 1936 | 30, 013 | $1. 1734 | $35, 217. 25 |
| 1937 | 30, 949 | 1. 1734 | 36, 315. 56 |
| 1938 | 31, 885 | 1. 1734 | 37, 413. 86 |
| 1939 | 32, 821 | 1. 1734 | 38, 513. 89 |
| Total | | | $147, 460. 56 |

$147,460.56 divided by 4 equals the Constructive Average Base Period Net Income of $36,865.14.

By comparing our figure of $36,865.14 with the petitioner's average base period net income of $34,900.75 computed under section 713 (f), we see that the difference is considerably less than petitioner's original figure of $57,574. Were we to stop there it might seem that some relief should be accorded to the extent of an increase of the base period income of approximately $2,000. This we can not do, however, since in order to arrive at the figure of $36,865.14 we must assume: first, that the same percentage of the local population would attend petitioner's theatres in 1936, 1937, and 1938 as would attend in 1939 and, second, that petitioner's profit margin per admission would remain the same. We do not feel that such assumptions are warranted by the evidence. As to the first, that business should have been as good prior to 1939 as during that year, petitioner's business would have to be an exception to the general business index for 1936 to 1939. See *East Texas Motor Freight Lines*, 7 T. C. 579, 595. If we apply the generally accepted business index there used to the present case we arrive at an average base period net income of only $31,763.22.[2] This is approximately $3,000 less than the amount respondent has allowed as base period income under section 713 (f). It is apparent then, that unless we can agree, which we do not, that petitioner's business was an exception to the general business index, the base period net income computed under section 713 (f) is greater than that computed under the reconstruction above. As for the second assumption, that the petitioner's profit margin per admission would remain the same through the base years, it is apparent that the 1939 profit margin would not survive under a reduced gross income. Petitioner's total admissions increased from $160,519.79 in 1938 to $182,922.22 in 1939—an increase of approximately 13 per cent. But petitioner's profit increased from $25,317.57 to $38,513.89 in those years—an increase of approximately 50 per cent. This would indicate that petitioner's net income is closely related to the amount its gross income exceeds fixed costs and that the 1939 profits would not survive very much of a decrease in attendance, which attendance we must assume is almost constant in relation to the population.

It is apparent from the above that a reconstruction of the petitioner's base period net income would yield a base of only approxi-

---

[2] Reconstruction of base income using 1939 as a normal year and correlating the other years to the general business index:

| Year | Business index in per cent of normal | Petitioner's income |
|---|---|---|
| 1936 | 96.9 | $37,319.96 |
| 1937 | 97.7 | 37,628.07 |
| 1938 | 35.6 | 13,710.94 |
| 1939 | 100. | 38,513.89 |
| Total | | 127,172.86 |

$127,172.86 divided by 4 gives an average base period net income of $31,763.22.

mately $2,000 in excess of the average income computed under section 713 (f). It is further apparent that the assumptions necessary to reach the base period income of approximately $36,000 and so to raise by approximately $2,000 the base under section 713 (f), are not justified in the light of the evidence. We hold, therefore, that petitioner is not entitled to any relief under the provisions of section 722 (b) (4).

We next consider whether or not the petitioner is entitled to any relief under the provisions of section 722 (b) (5). Following the interpretation by the Commonwealth Attorney that Sunday operation of theatres "would no longer be considered to violate the Virginia 'Blue-law,' " the petitioner first opened its theatres on Sunday in 1941. The petitioner contends that the fact that its theatres were not opened for business on Sunday until after the base period resulted in an inadequate standard of normal earnings during those years which makes it eligible for relief under section 722 (b) (5).

In the petitioner's reconstruction of average base period net income in its application for relief, the major adjustment is based upon an increase in that income for what it contends would have been realized had the theatres been open on Sunday during those years. The respondent contends that the petitioner's reconstruction on this ground is incorrect in that it takes into consideration events during the post base period years, which consideration is prohibited by section 722 (a).

The petitioner states the question under this subsection as:

Does the actual experience of the corporation during the base period afford a fair and just measure of its normal earnings * * *?

The difficulty with this approach is that it makes no allowance for the fact that section 722 is not a means of extending equitable aid to all taxpayers affected by the excess profits tax. Section 722 affords relief, not on broad equitable principles, but only if certain conditions existed. A basic condition to any relief under subsection (b) (5) is that such relief must not be inconsistent with the other principles and conditions of section 722 (b). Among those other principles and conditions is one that the constructive base period net income shall be determined without regard for "events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939. * * *" Thus, as a matter of law, events after December 31, 1939, cannot be considered. The petitioner insists, however, that its whole base period was abnormal and that this abnormality persisted until it began Sunday operations. This theory violates the base period concept of normal earnings.

From the time of its incorporation in 1929 the petitioner's operation was scaled to a 6-day week. There is no evidence that this was

an abnormal condition in the sense that the petitioner was maintaining an existence during those years waiting only for the day that it could open on Sunday. The record, on the contrary, shows that the business was a successful and profitable operation during those years from 1929 to 1940. True, it would in all probability have been more profitable during those years had it been able to open on Sunday. The fact that it was prohibited from doing so, as the Virginia "Blue-law" was then interpreted, does not prevent the business from being considered normal as we interpret that word in section 722., The policy of the petitioner's officers then in control of the business was in accord at the end of 1939 with the statutory prohibition against Sunday operation. The petitioner's management personnel changed during 1939, 1940, and 1941 in which latter year the statutory provision against Sunday operation was removed and it was then considered advisable to operate on Sunday along with the rest of the amusement facilities of Alexandria. The question of whether or not the petitioner's business was normal over the base period years and at the end of 1939, in so far as Sunday operation is concerned, must be answered in the affirmative. The relief provisions of section 722 (b) (5) are, therefore, inapplicable.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*