EAST TEXAS THEATRES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27268. Promulgated December 31, 1952.

*Milton H. West, Jr., Esq.*, and *Lamar Cecil, Esq.*, for the petitioner. *Irene F. Scott, Esq.*, for the respondent.

618

624

OPINION.

Black, *Judge:* In order for the petitioner to be entitled to general relief from excess profits taxes as provided by section 722 of the Internal Revenue Code, it must satisfy the two requirements appearing in section 722 (a) of the Code. The general rule, as contained in section 722 (a), provides as follows:

\* \* \* In any case in which the taxpayer [1] establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and [2] *establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period,* the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. \* \* \* [Brackets and italics have been added for emphasis.]

The first requirement of section 722 (a) of the Code, that the excess profits tax must be excessive and discriminatory, is further defined in some detail in subsections (b) and (c) of section 722 of the Code. As to the second requirement as italicized above there is no further definition of it in the Code. In December 1946, there appeared E. P. C. 6 (1946-2 C. B. 123–126) which discusses in some detail the concept of "normal earnings" as that term is used in the context of section 722 (a) of the Code.[3]

Petitioner contends it satisfies the first requirement of section 722 (a) of the Code under section 722 (b) because of one or more of the

---

[3] The term "normal earnings" appears also in subsection (b) of section 722 of the Code, but the term as used there is concerned with the test of whether or not the qualifying factor, as considered by itself in its effect on actual earnings during the base period, causes the taxpayer's average base period net income to be an inadequate standard of normal earnings. See *Green Spring Dairy, Inc.,* 18 T. C. 217 and E. P. C. 16 (1947-1 C. B. 190).

following factors: (1) the acquisition of additional theatres, wholly owned and jointly owned, during the base period years; (2) the increase in the seating capacity of certain of its theatres which were remodeled during the base period; (3) the operation of the confectionary units in petitioner's theatres for its own account after October 30, 1937, instead of leasing them to a concessionnaire, or, in the alternative, that by commencing on January 1, 1936, the sale of popcorn and confections in its theatres there was a difference in products furnished; (4) a change in the management of the Jefferson Amusement Company which managed the affairs of petitioner; (5) the gas explosion in the Consolidated Public School building at New London, Texas, on March 18, 1937, which resulted in the death or injury of a number of the children of families residing in the area served by certain of petitioner's theatres; and (6) the receipt, beginning in 1938, of income from an oil and gas lease on certain theatre property at Kilgore, Texas, in which petitioner owned an undivided one-half interest. Petitioner received a bonus of $1,000 in 1938 and actual production of oil began in 1939.

In its brief petitioner recomputed the amount of its CABPNI. In those computations petitioner adjusted its actual average base period net income by adding the following amounts:

|  | Excess profits tax year 1941 and subsequent years |
|---|---|
| Confectionary profits | $17,677.63 |
| Theatre profits | 25,892.92 |
| Oil lease profits | 2,256.83 |
| Total constructive increase in average base period net income | $45,827.38 |

Thus, in its brief petitioner in the reconstruction seeks no adjustments to its actual earnings during the base period for the alleged change in management of Jefferson Amusement Company or for the New London gas explosion, nor is there any indication in the record as to the approximate effect on petitioner's actual base period earnings of these two alleged factors. Therefore, we shall consider these two grounds as being no longer pressed by petitioner.

In order to be entitled to general relief under section 722 of the Code petitioner must establish for the applicable excess profits taxable year a constructive average base period net income larger than the following:

| Year | Average base period net income, as stipulated |
|---|---|
| 1940 | $112,501.76 |
| 1941 | 112,799.83 |
| 1942 | 116,744.51 |
| 1943 | 116,744.51 |
| 1944 | 116,321.84 |
| 1945 | 116,327.17 |

## Issue—Abnormal Net Income.

Respondent strongly contends in his brief that even if it be assumed that petitioner has proved one or more of the qualifying factors under section 722 (b) (4), that nevertheless petitioner cannot prevail because it had certain abnormal income during the base period years which must be excluded in arriving at any CABPNI and that when this is done, the CABPNI thus arrived at will be smaller than petitioner's average base period net income which has been stipulated and, therefore, petitioner would get no relief.

We shall first take up this contention of respondent for if the record sustains it, respondent contends that we would need to go no further because petitioner could not prevail.

In the absence of evidence indicating unusual conditions or events it is to be inferred, of necessity, that during the taxable years in the base period the actual earnings are normal earnings. That this is true is discussed in some detail in E. P. C. 6, *supra*. We quote from E. P. C. 6 two separate paragraphs pertinent in this proceeding:

In cases where there are actual earnings for any of the taxable years in the base period, such earnings will be considered normal (i. e., acceptable elements to be employed in the process of determining normal earnings) in the absence of factors requiring a contrary conclusion or of circumstances requiring a reconstruction based upon factors other than actual earnings. Thus, normal earnings will frequently be the average of actual earnings for the taxable years in the base period, adjusted to compensate for the effects of unusual and peculiar events and temporary economic circumstances. * * *

In using base period experience in the determination of normal earnings, it is necessary to take account of the abnormalities; i. e., *substantial and outstanding departures from the usual and ordinary income and expense that would be expected to characterize the profits history of the taxpayer during such period.* Thus appropriate adjustment will be made for all such abnormalities, whether favorable or unfavorable to the taxpayer and whether or not attributable to the qualifying factor. Such adjustment will usually take the form of eliminating, reducing, or increasing items of gross income or deduction. The abnormalities referred to in this paragraph do not include the high and low points in a variant cycle or sporadic profits experience because these extremes are characteristic of such experience. [Emphasis added.]

It seems to us that the above discussion as to what are normal earnings is sound and in harmony with the statute.

The excess profits tax is predicated upon the proposition of applying this tax to such profits as are in excess of the normal earnings from the operation of the taxpayer's business, *Philadelphia, Germantown & Norristown R. R. Co.*, 6 T. C. 789. In computing its tax credit on the basis of normal earnings under the provisions of section 711 (a) of the Code, the taxpayer may use the arithmetic average of its actual earnings during the base period years, which in general are the years 1936 to 1939, inclusive. In most of the cases wherein general relief

under section 722 (a) and (b) has been determined by this Court, it has been necessary to adjust the taxpayer's actual earnings during the base period years only to the extent that the qualifying factor would have affected actual earnings.

The respondent here contends that in the reconstruction of petitioner's normal earnings during the taxable years of the base period its actual earnings must be adjusted because of certain unusual conditions which existed during that period and from which petitioner received earnings which are not normal. In order to prevail in his contention, respondent must be able to show from the evidence that during this period income was received which was unusual, peculiar, or abnormal to the petitioner, and the evidence must further show that because of such abnormal income petitioner's actual earnings during the taxable years of the base period do not properly reflect the normal earnings of its business during that period. See *Studio Theatre Inc.*, 18 T. C. 548.

It is the respondent's contention that in the reconstruction of the CABPNI proper adjustments must be made for three unusual conditions from which petitioner received income which was not a part of petitioner's normal earnings. First, he contends that the decline of drilling operations in the East Texas oil field affected the earning capacity of a majority of petitioner's theatres. Secondly, he contends that there must be eliminated from actual earnings during the base period the income realized by petitioner from the conduct of a lottery, that is, "bank night" which was discontinued in June 1937. Thirdly, respondent contends that petitioner violated sections 1 and 2 of the Sherman Act and that in the reconstruction of the CABPNI the income arising from the maintenance of the monopoly must be eliminated from actual earnings during the taxable years in the base period.

The record is insufficient to establish, however, that "abnormal income" was, in fact, realized by petitioner because of its use of "bank night" programs for awhile in the early part of the base period years, or because of petitioner's relationship with the Jefferson Amusement Company, 50 per cent of which stock was owned by Paramount Pictures, Inc., or if such abnormal income was received, the amount thereof. There is consequently no occasion to discuss further these two items of alleged abnormal income. Cf. *Studio Theatre Inc.*, *supra*. There is nothing in the record which establishes any such abnormal income.

We think that respondent must also fail in his contention that petitioner received abnormal income in some of the earlier base period years between 1936 and 1939 because of the decline in oil drilling in the East Texas oil fields. The facts do establish that there was a decline in oil drilling in the East Texas oil fields during the base

period years and we have embodied findings of fact to show this decline. But we fail to see where that factor had anything to do with proving that petitioner had abnormal income which should be excluded in any of the base period years. Doubtless the attendance at some of petitioner's theatres which were situated in the East Texas oil fields during this period was increased when the drilling was heavy by reason of the larger number of workers in the field and doubtless the attendance was decreased when the drilling became less because of the decreased number of workers in the field, but we fail to see where these factors have anything to do with establishing the abnormality of income.

Petitioner's main source of income in all the base period years still remained paid admissions to its moving picture theatres and these admissions were its normal source of income. Whether these total admissions went up or down by reason of the fluctuating of oil drilling in the field would not affect their normalcy. E. P. C. 6, *supra*, among other things, says: "In using base period experience in the determination of normal earnings, it is necessary to take account of abnormalities; i. e., substantial and outstanding departures from the usual and ordinary income and expense that would be expected to characterize the profits history of the taxpayer during such period."

As an example of what we would deem to be abnormal income within the meaning of E. P. C. 6, *supra*, take the situation in *Premier Products Co.*, 2 T. C. 445. In that case the taxpayer corporation had acquired title to certain insurance policies on the life of its principal stockholder. The stockholder died and the corporation collected the insurance policies. We held under these facts that the net proceeds thus received constituted "abnormal income" as that term is defined in section 721 (a) (1) of the Code. While, of course, we do not have here the determination of what is abnormal income under section 721 (a) (1) of the Code, nevertheless, we do think that in order for income of a taxpayer seeking relief under section 722 of the Code to be excluded as "abnormal income" in arriving at a constructive base period net income it must be abnormal at least in somewhat the same sense as we held in *Premier Products Co.*, *supra*. If, for example, the life of petitioner's president had been insured for let us say $100,000 and the president had died during one of the base period years and petitioner had collected the policy, whatever income resulted to the petitioner by reason of the collection of the policy would have been abnormal income and could doubtless be excludible in a computation of CABPNI. But for reasons we have already explained we do not think that the fact that petitioner's base period net income may have been influenced to some substantial extent by the increase or decrease of oil drilling in the East Texas oil fields would have anything to do with characterizing

some of its income as "abnormal income." On this issue the Commissioner is not sustained.

We now further consider the second requirement of section 722 (a) of the Code and whether petitioner has established "what would be a fair and just amount of normal earnings" for the base period. When the reconstruction of normal earnings is based upon actual earnings of the taxpayer during the base period, the actual earnings must be adjusted for the effect of the qualifying factor or factors, and in addition for the effect of any other condition or event which was not a part of the normal operation of the taxpayer's business. It is so provided in section 722 (a) of the Code which reads "a fair and just amount" of normal earnings. It is incumbent upon the taxpayer if relief is to be granted to establish what is the amount of normal earnings, and if he fails to establish the amount of such earnings, then the general relief from excess profits taxes is to be denied the taxpayer. After examining the facts contained in the record, we have determined petitioner has fulfilled this second requirement of section 722 (a) of the Code.

If it is at all possible from the record we must determine what is the proper amount of the adjustment to be made to actual earnings during the base period in the reconstruction of normal earnings. We must do so even if the CABPNI is only a reasonable estimate based upon all the pertinent facts. *National Grinding Wheel Co.*, 8 T. C. 1278; *Victory Glass, Inc.*, 17 T. C. 381; *Jefferson Amusement Co.*, 18 T. C. 44.

In its brief petitioner proposes for the year 1940 a CABPNI of $149,-348.32 and for the year 1941 a CABPNI of $158,300.58. For the subsequent taxable years before us petitioner would adjust the base period years in a manner similar to that for 1941. For the year 1941, petitioner has proposed a CABPNI as follows, having additional schedules in its brief in support of the reconstruction:

| Year | Actual earnings | Confectionary profits | Theatre profits | Oil lease profits | Total |
|------|----------------|----------------------|-----------------|-------------------|-------|
| 1936 | $171,591.73 | $34,821.16 | $60,810.01 | $2,981.02 | $270,203.92 |
| 1937 | 102,279.42 | 17,511.01 | 15,197.49 | 3,325.97 | 138,313.89 |
| 1938 | 99,374.34 | 8,977.89 | 19,454.67 | 1,605.71 | 129,412.61 |
| 1939 | 76,647.33 | 9,400.45 | 8,109.51 | 1,114.61 | 95,271.90 |
| Totals | $449,892.82 | $70,710.51 | $103,571.68 | $9,027.31 | $633,202.32 |
| Average | $112,473.20 | | | | $158,300.58 |

## Oil Royalty Reconstruction.

We are satisfied that petitioner's adjustment to actual earnings for the oil lease profits is reasonable. For the first time in its period of existence petitioner received net income during the base period from oil royalties. Petitioner received a lease bonus of $1,000 in 1938 and

net income from oil production of $379.38 for the period October 11, 1939, through November 27, 1939. Actual earnings during the base period years 1936, 1937, and 1938 include no earnings from oil royalties, and for the year 1939 only oil royalties were received and included in actual earnings during a part of the year. In reconstructing normal earnings for the base period, petitioner's actual earnings during each of the base period years must, therefore, be adjusted for additional income based on the oil royalties. This has been done and the result is reflected in our Findings of Fact.

### Reconstruction—Popcorn and Confection Sales.

For certain of its base period years petitioner has reconstructed additional confectionary profits which it contends are to be added to its actual confectionary profits by applying year-to-year attendance ratios as the index for computing the amount of additional confectionary profits. In so doing, petitioner assumes that year-by-year *confectionary sales* will vary directly and in proportion to *theatre attendance* and petitioner also assumes that *confectionary sales* will vary directly and in proportion to *confectionary profits*. Such assumptions are not warranted from the record in this proceeding. While we cannot accept petitioner's reconstruction of what would be normal base period profits from its candy and popcorn business, the record shows that some adjustment is warranted in reconstructing normal earnings. We have done this and the result is reflected in our Findings of Fact.

### Reconstruction—Change in Capacity.

In reconstructing petitioner's normal earnings for each of the base period years as we have already considered the oil royalty income and candy and popcorn profits, the final adjustment to actual earnings is based upon the theatres added to petitioner's chain of theatres and a theatre remodeled during the base period. Petitioner's reconstruction of additional theatre profits when compared with the facts contained in the record is, in our opinion, greatly overstated. Respondent in his brief has pointed out several objections to the reconstruction as made by petitioner under this particular ground for 722 (b) (4) relief. Some of these objections, we think, are good. We shall not undertake in this opinion to enter into a detailed discussion of these objections.

After a consideration of all the facts we have found in our Findings of Fact that:

\* \* \* In a reconstruction of petitioner's average base period net income for the purpose of arriving at petitioner's CABPNI, there should be added to petitioner's average base period net income as adjusted for the 711 (b) (1) (J) abnormalities during the base period, $2,000 due to change in capacity during the

base period by reason of the addition of certain theatres and the remodeling of one theatre.

That figure will be used in a computation under Rule 50.

As we have heretofore stated, petitioner and respondent have stipulated that petitioner's average base period net income as adjusted for section 711 (b) (1) (J) abnormal deductions during the base period for each excess profits tax year was as follows:

| Year | Amount |
|------|--------|
| 1940 | [4] $112, 501. 76 |
| 1941 | 112, 799. 83 |
| 1942 | [5] 112, 481. 43 |
| 1943 | [5] 112, 481. 43 |
| 1944 | [5] 112, 143. 28 |
| 1945 | [5] 112, 147. 55 |

Petitioner's section 711 (b) (1) (J) abnormal deductions were based upon legal and auditing expenses and taxes incurred by petitioner during the base period years. The adjustments arising under section 711 (b) (1) (J) and (K) are not inconsistent with the basis upon which we have computed petitioner's relief. See *Jefferson Amusement Co., supra.* See also the last paragraph quoted heretofore in this opinion from E. P. C. 6, *supra.*

It is, therefore, determined that petitioner is entitled in the computation of its excess profits tax to use as a CABPNI the above amounts, plus $7,506.83 which is the sum of the reconstruction which we have determined should be made because of the three 722 (b) (4) factors which we have above discussed. Having held that petitioner is entitled to certain relief under section 722, the constructive carryover from 1940 will be computed in accordance with the applicable statute and regulations under Rule 50. See *Jefferson Amusement Co., supra.*

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

---

[4] Computed under 1941 law for carry-over purposes.

[5] Without giving effect to section 713 (e) of the Code which is effective for taxable years beginning after December 31, 1941.

