THE PELTON AND CRANE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31575.   Promulgated September 10, 1953.

*Samuel E. Gawne*, Esq., and *J. Donald McLeod*, Esq., for the petitioner.
*Edward E. Pigg*, Esq., for the respondent.

---

968

OPINION.

## Section 722 (b) (1). Unusual Event.

WITHEY, *Judge:* Petitioner bases its claim for relief on section 722 (a),[1] (b) (1),[2] (2), and (4) of the Internal Revenue Code. We have stated in *D. L. Auld Co.*, 17 T. C. 1199, and *Triangle Raincoat Co.*, 19 T. C. 548, that strikes are the type of events coming within the ambit of subsection (b) (1).

Respondent concedes that petitioner experienced a 10-day strike in May 1937 but contends that the mere fact of a strike does not of itself entitle petitioner to relief. In order to qualify for the use of a constructive average base period net income in the computation of its excess profits credit petitioner must show that as a result of the strikes and "slowdowns" its base period net income was depressed to the extent that its average base period net income was an inadequate standard of normal earnings. *Triangle Raincoat Co., supra.*

Petitioner contends that the strikes and "slowdowns" damaged its manufacturing operations by causing a heavy labor turnover, thus increasing labor costs and decreasing its sales. Petitioner has not shown that its labor turnover was unusually large. On the contrary, petitioner fared much better than its competitor, the automotive industry, for the labor supply. It had a labor turnover during the base period of 62 per 100 employees as against a yearly average of 86 per 100 employees for the automobile and body industry. There is no showing here that its labor turnover was unusual in its experience. It is equally as possible that such turnover as it did experience was attributable as much to its low wage scale as to the strikes and

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence. either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

"slowdowns." We are unable to determine the cause because of the lack of any showing as to petitioner's experience in that regard prior to the base period.

In regard to petitioner's increased labor costs, we find that its cost of goods sold for the base period was 64 per cent of its sales while its cost of goods sold for the 14-year period, 1922 to 1935, inclusive, was 63 per cent of sales. An increase of 1 per cent in cost of goods sold hardly sustains petitioner's contention that its labor turnover thereby caused a serious decrease in its average base period net income.

Examination of the entire record does not indicate a serious interruption or diminution of production or operations because of the strikes or the occasional "slowdowns." We note that petitioner had an average of 75 employees in 1936, which year petitioner concedes was a normal year. For the first 8 months of 1937 the average number of employees continued to be 75. During the last 4 months of 1937 the number of employees dropped to 60. During 1938 the number of employees averaged about 52 during the whole year. In 1939 the average increased to 60 towards the last half of the year. A comparison of the number of employees with the sales of products during the base period discloses that as the sales of lights decreased in 1937, 1938, and 1939 the number of employees also decreased. It is obvious that petitioner had to decrease the number of employees when the demand for its lights was sharply decreased. The only conclusion that can be reached is that petitioner lost its competitive position in the dental light field because of its refusal to modernize its Cluster light which was one of its established products and had been in the words of its treasurer and manager a "world-beater." In 1935 at its autumn sales conference, it was decided that petitioner should take advantage of the ground work laid in the past years for the Cluster light and adhere strictly to the cluster type, even though in 1935 one of its competitors, Ritter Dental Manufacturing Company, had placed on the market the Ritter Dualite. The petitioner's position at that time was that sales of the Ritter Dualite had not been too successful, it served no specific dental need, and dentists were getting their investment out of the light by using it for general illumination, and since the Cluster light served the same purpose it was not necessary to make any improvements in its product.

In July of 1937 Wilmot-Castle introduced to the market its Tru-Vision light which was an immediate success. The effect of this light on petitioner's light sales was readily noticeable in 1938 and 1939 when its sales of lights were $18,000 and $46,000, respectively, as compared to 1936 when its sales were $113,000. At the same time its sales of sterilizers, compressors, dental lathes, and cuspidors and income from repairs and replacements varied but slightly from its normal year of

1936. Its total sales for all products except its dental lights during the base period years were as follows:

| | |
|---|---:|
| 1936 | $256,392 |
| 1937 | 236,962 |
| 1938 | 222,895 |
| 1939 | 257,033 |

Its total sales of dental lights for the base period years were as follows:

| | |
|---|---:|
| 1936 | $113,511 |
| 1937 | 87,157 |
| 1938 | 18,508 |
| 1939 | 46,253 |

Petitioner's contention that the strikes and "slowdowns" were the reasons for its drop in net income is not borne out by the above comparison. The fact is that its refusal to modernize and improve its lights as its competitors had done was the cause of its decreased income.

### Section 722 (b) (2). Temporary Economic Circumstances.

The petitioner also requested relief under section 722 (b) (2) in its petition and its brief. This ground for relief was not requested by petitioner in its original application filed with the respondent.

This Court has clearly indicated in its prior decisions that it will not consider grounds for relief or supporting facts unless they have been presented to the Commissioner for his consideration prior to the rejection of the applications and claims. *Hummel & Downing Co.,* 19 T. C. 61; *Blum Folding Paper Box Co.,* 4 T. C. 795; *Monarch Cap Screw & Mfg. Co.,* 5 T. C. 1220; *Alexandria Amusement Corporation,* 16 T. C. 446; and *Wadley Co.,* 17 T. C. 269. It does not appear in this case that petitioner amended its application to include a claim for section 722 (b) (2) relief prior to the denial of the claim by the Commissioner. We, therefore, cannot give consideration to the section 722 (b) (2) ground for relief.

### Section 722 (b) (4). Change in Character of Business.[3]

The second ground for relief in this proceeding is based on section 722 (b) (4). The petitioner's contention is that section 722 (b) (4)

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income

applies because petitioner changed the character of its business during the base period by introducing the E & O light, which represented a difference in the products furnished and therefore the average base period net income does not reflect the normal operation for the base period which would have been reached had the change in the character of the business taken place 2 years before it did. A change in character includes a difference in the products.

Did the introduction of the E & O light constitute a difference in products furnished by petitioner? The record shows that petitioner had manufactured dental lights throughout its existence. Its first light was the Cluster light which had a ball joint permitting the dentist to tilt the light in various positions to illuminate the oral cavity. Through the years petitioner had introduced new models and made various modifications to its lights. It made and sold the Flood light in 1935, Localite in 1936, Equalite in 1937, the Utility light late in 1938, Oralite in 1939, and E & O light in 1939. These were merely technological changes necessitated by changes competitors had made in their lights. The Cluster light had been the principal light used by dentists and surgeons for operating until it was outmoded. The E & O light was simply an improvement. Such changes were necessary if petitioner was to maintain its standing in the dental light market. The test of whether a different product has been introduced requires something more than a routine change customarily made by businesses. A change in character must be substantial. See *East Texas Theatres, Inc.*, 19 T. C. 615, and *Jefferson Amusement Co.*, 18 T. C. 44, where motion picture houses started selling candy and popcorn; and *Lamar Creamery Co.*, 8 T. C. 928, where the petitioner began manufacturing and selling ice cream mix. These cases demonstrate the marked "difference in the products * * * furnished" which entitles the taxpayer to relief under section 722 (b) (4). The product here involved does not represent the requisite "difference" for relief under this section; it did not change the character of petitioner's business; it did not affect the type of customers solicited, open new markets, change sales policies, or affect manufacturing. *Triangle Raincoat Co., supra; Stonhard Co.*, 13 T. C. 790. See also respondent's Bulletin on Section 722, at page 52.

---

does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the businesss" includes a change in the operation or management of the business, a difference in the products or services furnished, * * *

Petitioner's record of units sold shows that it was continually modifying its products and bringing out new models. From 1936 through 1939 sixteen items were discontinued and fourteen took their places. The record does not disclose any sales of petitioner's wall Cluster light in 1939; it is disclosed that Flood lights were discontinued in 1938. These facts indicate that the new E & O light was merely a needed modification and improvement of petitioner's other lights. This case is similar in principle to *Avey Drilling Machine Co.,* 16 T. C. 1281, where we stated:

We think the evidence does not justify a conclusion that Avey "changed the character of the business" within the intent of the statute by reason of the invention and development of its new model machines. Avey, and other members of the machine tool industry, found it necessary to survival in business to do research and development to keep up with the demands of their customers and the improved products of their competitors. Avey's customers were demanding machines of greater spindle speed and Avey's development of improved machines was necessary to prevent loss of its business to competitors who were at the same time improving their machines to meet the same customer demand. The changes, we think, cannot be characterized as more than improvements. Avey was in the business of building precision drilling machines used to drill small holes in metal. The new machines served the same purpose as the old and, generally, were sold to customers in the same industries as before. A change in character, within the intent of the statute, must be a substantial departure from the preexisting nature of the business. * * *

Every business is constantly required to produce better services and modify its products to maintain its sales, but the statute does not contemplate granting relief on the basis of such changes. *Stonhard Co., supra.*

A consideration of the entire record does not warrant a finding that petitioner introduced such a substantially different product as to constitute a change in the character of its business for the purposes of section 722 (b) (4).

We conclude from all the evidence that petitioner's excess profits taxes, computed without the benefit of section 722, are not excessive and discriminatory and that petitioner has not established a right to relief under section 722.

In view of the fact that petitioner has not established that it qualifies for relief under section 722 (b) (1) and (4), it is unnecessary to consider its method of reconstructing average base period net income.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*