**ROGERS CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 74, 75, Dockets 26309, 26310.**

United States Court of Appeals Second Circuit.

Argued Dec. 16, 1960.

Decided May 15, 1961.

---

Richard N. Bail, Boston, Mass. (Gaston, Snow, Motley & Holt, Boston, Mass., of counsel), for petitioner.

Harry Marselli, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson, Atty., Dept. of Justice, on the brief), for respondent.

Before LUMBARD, Chief Judge, and MAGRUDER and FRIENDLY, Circuit Judges.

MAGRUDER, Circuit Judge.

The Tax Court of the United States entered decisions on January 28, 1960, to the effect that there existed a deficiency in the taxpayer's income (excess profits) tax for the calendar years 1950 and 1953 in the respective sums of $12,-369.21 and $42,678.50. These decisions were made pursuant to the court's findings of fact and opinion filed the previous day. 33 T.C. 728. These two decisions are now before us upon the filing by the taxpayer of a petition for review. We think that the Tax Court decided the issues correctly and that its decisions should be affirmed by this court.

Involved in this case are the applicable provisions of the Korean War Excess Profits Tax Law, 64 Stat. 1137, an Act which was largely modeled upon the World War II Excess Profits Tax enacted by the Congress in 1942. 56 Stat. 899.

In the Excess Profits Tax Act of 1950, the Congress aimed to tax "corporate profits which have been swollen by the increased tempo of the economy." H.R. Rep.No. 3142, 81st Cong., 2d Sess. 2 (1950), 2 U.S.Code Congressional Service 1950, p. 4027. The average yearly income during a so-called "base period," which was defined in the Act as meaning "the period beginning January 1, 1946, and ending December 31, 1949" (64 Stat. 1149), became the norm for an extra tax upon "those corporations whose profits are higher than they probably would have been in the absence of hostilities and a large military budget." S.Rep.No. 2679, 81st Cong., 2d Sess. 2 (1950).

Of course there may be situations in which the actual earnings during the base period are not "normal," and in some of these the Act allows a constructive norm to be used. The question here is whether the taxpayer was entitled to relief based upon § 443 of the Act, which reads in part as follows:

"Sec. 443. Average base period net income—change in products or services.

"(a) In General.—If a taxpayer which commenced business on or before the first day of its base period establishes with respect to any taxable year that—

"(1) During so much of its three immediately preceding taxable years as falls within the 36-month period ending on the last day of its base period, there was a substantial

change in the products or services furnished by the taxpayer,

"(2) More than 40 per centum of its gross income or 33 per centum of its net income for such taxable year is attributable to one or more of the new products or services, and

"(3) Its average monthly excess profits net income (determined under subsection (e)) for such taxable year exceeds 125 per centum of its average monthly excess profits net income (determined under subsection (e)) for the taxable years ending within its base period and prior to the taxable year in which the first change to which gross income is attributed for the purpose of this subsection occurred, then, in computing its excess profits credit for taxable years under this subchapter which end on or after the last day of the earliest taxable year with respect to which the requirements of paragraphs (1), (2), and (3) are satisfied, its average base period net income determined under this section shall be the amount computed under subsection (b)." 64 Stat. 1166.

A full statement of the facts may be found in the report of the Tax Court in 33 T.C. 728. For present purposes we need not state the facts in such minute detail. During the period under review, the taxpayer, a Connecticut corporation, had its principal place of business in Killingly, Connecticut. It also had another factory at Manchester, Connecticut. The Killingly plant produced special paper boards mainly for electrical insulation, and the Manchester plant was primarily engaged during the period 1941–1949 in carrying out a contract with the Bakelite Corporation. That contract provided that the taxpayer should produce resinous-pulp board products as these were ordered by Bakelite; the taxpayer supplied labor, facilities, and raw materials other than resins; Bakelite controlled the specifications of

products and supplied all resins, to which it retained title. Bakelite was to pay certain prices per pound of "board," subject to change in taxpayer's raw material and labor costs. This arrangement continued until the end of July, 1949, when, pursuant to due notice, Bakelite withdrew from the contract.

At this time the taxpayer purchased the chemicals which were still on its premises and received from Bakelite a list of buyers of the produce of the Manchester plant during the operation of the contract. Other than this, the taxpayer was forced to find its own outlets and it had to set up a sales force which was necessary to service the new customers and also those which had formerly bought from Bakelite. In addition, the taxpayer instituted its own research program and produced some of its own resins. It seems to be conceded by the taxpayer that, after the contract with Bakelite expired, it continued to produce at the Manchester plant about the same products as theretofore. The cases say that the change must have been "substantial." The Pelton & Crane Co., 1953, 20 T.C. 967; A. B. Farquhar Co., 1957, 28 T.C. 748. To avoid the effect of these decisions, the taxpayer has invented the slogan that its change was a total change from "services" to "products."

In a sense it is no doubt true that under the contract the taxpayer was an "agent" which merely provided a "service" to Bakelite Corporation, whereas now the taxpayer has more freedom in selling what it makes at the Manchester plant. We do not think that this change was "a substantial change in the products or services furnished by the taxpayer," within the meaning of § 443(a) (1). We therefore need not pass upon the alternative ground taken by the Tax Court to the effect that the taxpayer had failed to show, as required by § 443(a) (2), that "40 per centum of its gross income or 33 per centum of its net income for such taxable year" was attributable to one or more of the new products or services.

The relief provisions of § 443 of the Second Excess Profits Tax Law were modeled somewhat upon those of § 722 of the earlier Act. According to § 722(b) (4) of the 1940 Act, 26 U.S.C.A. Excess Profits Taxes, § 722(b) (4), earnings during the base period were recognized to be an inadequate standard of normal earnings when, among other things, there had been either "a change in the operation or management of the business, a difference in the products or services furnished, [or] a difference in the capacity for production or operation." 54 Stat. 986, 56 Stat. 915. The Congress recognized in drafting the 1950 Act that the relief provisions of § 443 were more restrictive than § 722(b) (4) had been, in that § 443 afforded relief only where there had been a substantial change in the products or services furnished by the taxpayer. As stated in H.R.Rep.No. 3142, 81st Cong., 2d Sess. 18–19 (1950):

"(2) *New products or services introduced in the base period.*—For corporations which commenced business on or before the first day in the base period and which added new products or services in the base period, for which an adjustment was authorized by section 722(b) (4) of the World War II law, your committee's bill provides relief by means of a formula. * * * The concept of what constitutes a change in product or service was developed under the prior excess profits tax law, and it is believed that the experience thereunder was generally satisfactory. * * * Your committee is aware of the fact that the relief provided by section 722(b) (4) of the prior law was available in several areas beyond that involving solely a change in products or service to which the present bill is limited." See also, S.Rep.No. 2679, 81st Cong., 2d Sess. 24–25 (1950).

■ Although there are a substantial number of reported cases dealing with the provisions of the 1940 Act, it is not surprising that none of them considers the exact question presented in this petition. Indeed, the question whether an alleged change from "services" to "products" had been made would most likely have never been met with under the earlier Act, since such a change would surely have resulted in a "change in the operation or management of the business." We think that the Congress evidently had in mind in § 443 a physical change in the products or services furnished at a factory, not a change in the mere incidents of the marketing relationship.

Judgments will be entered affirming the decisions of the Tax Court.