PHILADELPHIA, GERMANTOWN AND NORRISTOWN RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7107. Promulgated April 22, 1946.

790

*John E. McClure, Esq.*, for the petitioner.
*Ralph A. Gilchrist, Esq.*, for the respondent.

792

OPINION.

HILL, *Judge*: The petitioner contends that the. facts in this case bring it squarely within the intent, purpose, and letter of the provisions of section 722, and in particular section 722 (a) and (b) (5), of the Internal Revenue Code.[1]  It designates the lease entered into on

---

[1] (a) GENERAL RULE.—In any case in which the taxpayer established that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average

November 10, 1870, between it and Philadelphia & Reading Railroad Co. as the "factor affecting taxpayer's business" which makes its excess profits tax "excessive and discriminatory."

To be entitled to relief under section 722 petitioner must establish not only that its "base period net income is not a fair measure of normal earnings," (Committee on Finance Report No. 1631, 77th Cong., 2d sess., p. 196) but it must also establish that the "average base period net income is an inadequate standard of normal earnings, *because* of the factor affecting the taxpayer's business." (Emphasis supplied.) See section 722 (b) (5), which is the provision relied upon by petitioner in this case.

The term "an inadequate standard of normal earnings" is not defined in the statute. In *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, it is stated:

> The word "normal" is susceptible of different, or varying meanings. * * * In relation to its context we think that the whole phrase of "an inadequate standard of normal earnings" refers to a standard or measure of earnings which falls below that established over a reasonable length of time and under normal conditions by the taxpayer or by other taxpayers engaged in the same or a similar business under comparable conditions. It is such a standard as would result in "an abnormally low excess profits credit." Senate Finance Committee Report, *supra*. [No. 1631, 77th Cong., 2d sess., p. 197.[2] See also p. 35 of same report.[3]]

base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayer generally occurring or existing after December 31, 1939, * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

[2] In the light of the greatly increased excess profits tax rate, it is believed desirable to afford relief in meritorious cases to corporations which bear an excessive tax burden because of an abnormally low excess profits credit. Therefore section 722 which currently extends relief only in a limited class of cases is revised and broadened so as to remove existing inequities and to alleviate hardship in cases where relief cannot now be obtained. * * *

[3] Your committee has adopted the provisions of the House Bill [Revenue Bill in 1942] relating to general relief for excess-profits tax purposes with certain modifications. It is recognized that specific legislation cannot take care of all of the harsh cases which may arise under a high excess-profits tax and that legislation of a general nature is necessary to provide relief for many unforeseen hardships which may arise under the excess-profits tax law.

Under the House Bill, taxpayers who are entitled to use the average-earnings basis are permitted to have their base period earnings reconstructed in cases of abnormalities or hardships. In order to secure the benefit of this provision, taxpayers must meet certain specific tests to establish that their actual earnings during the base period are abnormal. * * *

After 1870 and throughout the base period years and the excess profits tax years, petitioner's sole activities were the owning and holding of properties and the distribution of their avails. The petitioner's largest item of income was $269,623.34, designated as the "yearly rent" in the lease made in 1870 covering all of its railroad properties. In addition the lessee paid to petitioner $8,000 for the maintenance of its corporate existence. The lessee also paid each year $414, the ground rent charged on the real estate demised. These three items were the same in the excess profits tax years 1940, 1941, and 1942. Petitioner's income, exclusive of the above enumerated items and exclusive of the item of additional rental in 1936 of $5,918.34, a small item of other income in 1941 of $32.42, and its income and excess profits taxes paid by lessee, consisted of dividends and interest. During the base period years, 1936 to 1939, inclusive, such income aggregated $2,131.80, $2,007.84, $2,189.11, and $1,841.81, or an average of $2,042.64 per year. The average amount of such dividend and interest income for the three excess profits tax years was $2,314.14. An additional item of income which petitioner was required to include in its gross income for tax purposes was the Federal income tax paid by the lessee. The amount so included in gross income and the amount of tax actually paid by the lessee in each of the base period years and the excess profits tax years are as follows:

| Base period years | | | Excess profits tax years | | | |
|---|---|---|---|---|---|---|
| | | | | | Paid by lessee | |
| Year | Included in gross income | Paid by lessee | Year | Included in gross income | Income tax | Excess profits tax |
| 1936 | $40,303.85 | $46,501.00 | 1940 | $64,709.60 | $80,658.70 | |
| 1937 | 39,384.53 | 45,407.68 | 1941 | 83,333.23 | 103,888.05 | $18,770.30 |
| 1938 | 44,487.73 | 53,016.89 | 1942 | 107,849.33 | 122,122.94 | 60,566.40 |
| 1939 | 44,487.73 | 53,157.55 | | | | |

Obviously, the only change of any consequence between petitioner's gross income in its base period years and its gross income in the excess profits tax years occurred in the amount of taxes paid by the lessee and included in petitioner's gross income.

Petitioner contends that "the addition to its income of the constantly increasing income and excess profits taxes gave rise to conditions affecting it, resulting in an average base period net income which is not an adequate measurement for the determination of excess profits." It states on brief that its excess profits tax is excessive and discriminatory because its excess profits net income resulted solely from:

(a) The imposition upon petitioner in 1941 and 1942 of *Federal income taxes at increased rates* and their payment by the lessee under a lease and contract entered into in 1870, and

(b) The inclusion in petitioner's 1941 and 1942 income of greater amounts of *Federal income taxes* paid by the lessee, than were included in its base period income.   [Emphasis supplied.]

From such statement it clearly appears that it is the taxes at increased rates or increased taxes of petitioner paid by the lessee and included in petitioner's gross income for 1941 and 1942 which, it is claimed by petitioner, make its average base period net income an inadequate standard of normal earnings.   That this is petitioner's contention also appears from petitioner's suggested alternative method for the computation of a constructive average base period net income.   It states that, since the "factor affecting the petitioner's business which may reasonably be considered as resulting in the petitioner's average base period net income being an inadequate standard for measuring its excess profits is the fact that the Federal income tax rates in effect in the base period were less than the Federal income tax rates in effect in 1941 and 1942," an "appropriate adjustment for this factor would be to recompute petitioner's average base period net income on the basis of 1941 and 1942 rates having been in effect throughout the base period."   For the purpose of computing its 1941 excess profits credit petitioner suggests the exclusion of the amount included in the excess profits net income for each of the base period years and the inclusion therein in lieu thereof of the amount of $83,333.23, the amount of taxes paid by the lessee included in 1941 gross income, and for the credit for 1942 it suggests the inclusion in excess profits net income for each of the base period years of $107,849.33, the amount included in 1942 gross income.

Section 722 (a) expressly provides:

In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayer generally occurring or existing after December 31, 1939.

Obviously, if events or conditions occurring or existing after December 31, 1939, may not be considered in determining constructive average base period net income which is to be used in lieu of the average base period net income otherwise determined under subchapter E, it follows that such events or conditions may not be regarded as "any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period," for to do so would nullify the above quoted provision.

Furthermore, the requirement that the lessee pay petitioner's taxes arose in 1870, upon the execution of the lease, and it has been in existence ever since.   All taxes assessed against the petitioner since that year have been paid by the lessee.   To obtain relief under section 722 (b) (5) the petitioner must establish that the application of the

section "would not be inconsistent with the principles underlying the provisions of" subsection (b) and "with the conditions and limitations enumerated therein." One of such limitations enumerated therein is that the "event or condition affecting the taxpayer" must occur or exist "either during or immediately prior to the base period." See sec. 722 (b) (1), (2), (3), and (4) and Committee on Finance Report No. 1631, 77th Cong., 2d sess., pp. 198–203.[4] Neither the lease nor the requirement that the lessee pay petitioner's taxes was unusual or abnormal in the sense that either arose in the base period or immediately prior thereto or in the sense that either created or brought about unusual or abnormal or unforeseeable conditions or results. On the contrary, the payment by the lessee of petitioner's income and excess profits taxes was but the fulfillment of the intent and purpose of the provisions of the lease.

The petitioner argues that its income is not of a type intended to be reached by the excess profits tax, since: "The excess profits tax is specifically designed to recapture a portion of profits due to the expansion and creation of activities by the war efforts" (sec. 35.722–3 (e), Regulations 112, p. 151); that the excess profits taxes involved herein are due to the inclusion in the technical or statutory income of the amount of income tax imposed by the Government; that the taxes were paid by the lessee directly to the collector or the United States Treasury and were not "actually received" by the petitioner "for its own use"; and

---

[4] To be eligible for relief, taxpayers which are entitled to use the average earnings credit under section 713 must establish that the average base period net income is not a fair measure of normal earnings because of one or more of the following reasons:

\* \* \* \* \* \* \*

5. The business of the taxpayer during the base period was adversely affected by any other factor, resulting in an average base period net income which is an inadequate standard of normal earnings, and the taxpayer's claim for relief and the application of the relief as provided in this section would not be inconsistent with the principles underlying the eligibility requirements and the conditions and limitations set forth therein. Thus, corporations which do not meet the strict eligibility requirements set forth in this section are not debarred from relief if their case is within the spirit of the statute and if its application would not be inconsistent with its principles and conditions and limitations.

An example which your committee believes illustrates this paragraph would be a taxpayer which shortly before the base period undertook a business involving the manufacture of a product requiring an extensive period for preparation or manufacture, and which had no stocks of such product on hand at the commencement of such business. Since a large portion of the base period would be devoted to preparation of the product for sale, and since sales would consequently be small or nonexistent and would not serve as a measure of the normal operations of the business, the base period would represent an abnormal standard by which to compute excess profits. Although in such a case, it might be said that the business was not depressed during the base period since it was operating at full manufacturing capacity, and thus might not be entitled to relief under paragraph 2, it would seem clear that such a taxpayer is entitled to relief by way of a constructive excess profits net income based upon normal operations. For example, assume that a taxpayer was organized in 1935 to distill and sell whisky. It had no reserve whisky stocks on hand. During 1935 and for the greater part of its base period, it was aging the whisky it had distilled. Because of a lack of a marketable product, the sales of such taxpayer, and consequently its base period net income, were abnormally low and do not reflect results of usual operations. Relief should be extended to such taxpayer, the base period net income of which would not have been distorted if it had adequate whisky stocks on hand at the beginning of the base period.

that, if it had not been required to include the amounts of $83,333.23 and $107,849.33 in its 1941 and 1942 gross income, its excess profits tax liability for such years would have been zero.

Although the excess profits tax arose out of the congressional desire "that the rearmament program should furnish no opportunity for the creation of new war millionaires or further substantial enrichment of already wealthy persons," as appears from Ways and Means Committee Report No. 2894, 76th Cong., 3d sess., pp. 1–2, the committee also stated therein (pp. 1–2) that the tax was to be a "general excess-profits tax" and not one limited to business engaged directly in the defense program or even to munition manufacturers generally, but that the "tax provided in the bill [Second Revenue Bill of 1940] will apply to corporate profits from all sources." Hence, the fact that the taxes paid by the lessee may not be profits "due to the expansion and creation of activities by the war effort" is not controlling.

Moreover, section 711 of subchapter E, entitled "Excess Profits Tax," provides that the "excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal tax net income, as defined in section 13 (a) (2) for such year," subject to adjustments of certain "unusual and nonrecurring items." See Committee on Ways and Means Report No. 2894, 76th Cong., 3d sess., p. 8.[5] That payments by a lessee of taxes of the lessor constitute additional rent taxable to the lessor was definitely established in 1929 by the Supreme Court in *United States* v. *Boston & Maine R. R.*, 279 U. S. 732. Payments of taxes assessed against the lessor and paid by the lessee have been includible in gross income for the purpose of computing the normal tax net income for many years prior to the periods here involved. We are unable to find and petitioner points to no provision contained in subchapter E which indicates that taxes of the lessor paid by the lessee should be regarded as an unusual, nonrecurring, or abnormal income item for the purposes of the excess profits tax. Under the circumstances the fact that the amount paid by the lessee for petitioner's taxes was not "actually received" by it, but was paid direct to the collector, is not of great import.

The "standard of normal earnings" for a period of 999 years from December 1, 1870, was actually established by the lease executed in 1870. As heretofore pointed out, the amount of the taxes paid by the lessee each year constituted a part of the normal earnings of petitioner for Federal income and excess profits taxes. Since the lessee performed all its obligations under the lease during the base period

---

[5] The adjustment of income to take care of these unusual and nonrecurring items makes for equity and the removal of hardship which would otherwise occur.

years, petitioner's average base period net income conformed to the "standard of normal earnings" established by the lease.

Except to state that the essential facts demonstrate inequities and hardships, the petitioner does not specify the inequities and hardships resulting to it from the imposition of the excess profits tax. It concedes that each year since 1870 it received and had available for distribution to its stockholders substantially the same amount of income, viz., $269,623.34, the amount designated as yearly rent. This was so because the lessee was required to pay all taxes. In this respect petitioner's position was not different from that of prior years.

In our opinion, the evidence fails to show that petitioner is entitled to relief from excess profits taxes for 1941 and 1942 under section 722 of the Internal Revenue Code.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*