TELFAIR STOCKTON AND COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6164.    Promulgated November 19, 1953.

*Robert P. Smith, Esq.*, for the petitioner.

*Newman A. Townsend, Jr., Esq.*, and *William J. Stetter, Esq.*, for the respondent.

**OPINION.**

*Issue 1. Section 711 (b) (1) (J) and (K) Adjustment.*[1]

WITHEY, *Judge:* During the base period years, February 28, 1937 to 1940, inclusive, petitioner paid the following amounts to Telco Holding Company under the provisions of the March 1, 1932, contract:

| | |
|---|---|
| Feb. 28, 1937 | $3, 761. 75 |
| Feb. 28, 1938 | 15, 300. 00 |
| Feb. 28, 1939 | 10, 424. 68 |
| Feb. 29, 1940 | 13, 704. 04 |

---

[1] SEC. 711. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)):

\* \* \* \* \* \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deduc-

These amounts were deducted each year by petitioner and allowed by respondent in computing its net taxable income. The issue before us is whether in determining petitioner's excess profits credit under section 713, Internal Revenue Code, for the fiscal year ended February 28, 1943, these payments which were made by petitioner during the base period to Telco Holding Company pursuant to their contract, dated March 1, 1932, should be disallowed as abnormal deductions under section 711 (b) (1) (J) and (K), Internal Revenue Code.

The petitioner argues alternative contentions on this issue. It first contends that the 50 per cent payments to Telco were abnormal deductions (section 711 (b) (1) (J) (i)), or, secondly, if the 50 per cent payments to Telco were normal deductions, they are in excess of 125 per cent of the 50 per cent payments to Telco allowed as deductions for the 4 previous years (section 711 (b) (1) (J) (ii)). It further asserts that the abnormality is not in consequence of an increase in its gross income in its base period or a decrease in the amount of some other deduction in the base period and is not a consequence of a change at any time in the type, manner of operation, or condition of its business.

Respondent admits the 50 per cent payments to Telco exceed 125 per cent of the average of the payments allowed to Telco for the 4 previous years but claims the payments are not abnormal and also that the disallowance of the payments is prohibited by the provision of section 711 (b) (1) (K) (ii), Internal Revenue Code, because the abnormality was a consequence of an increase in gross income.

Petitioner's contention that the 50 per cent payments were abnormal deductions is based on the argument that it entered into a "bad deal," that the management business, which was expected to furnish the majority of the income, was a failure and the major part of the income that it earned was a result of its development of the insurance brokerage business. The contract provided as follows: (1) The petitioner was to purchase Telco's real estate and insurance brokerage business and furniture and fixtures for the sum of $27,500, which would be sufficient to satisfy Telco's current obligations; (2) Telco would then hypothecate all remaining assets, not encumbered, as additional collateral for the obligations owed to the banks; and (3) petitioner would

---

Footnote 1—Continued.

tions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

    *        *        *        *        *        *        *

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

pay to Telco 50 per cent, after adjustment, of its profits for the right to operate and manage the properties of Telco. The contract is actually in two parts, i. e., the purchase of the real estate and insurance business being one part and the right to manage Telco's properties in return for 50 per cent of its profits, after adjustment, being the other part. The petitioner would have acquired no more after having made payments for the full 10-year period than it would have acquired if the banks had taken steps to enforce their rights at the end of the first year. The contract is an outright conveyance to petitioner by Telco of Telco's real estate and insurance brokerage businesses. The period in which petitioner would operate and manage Telco's properties and pay to Telco 50 per cent of its profits would be terminated by the happening of (a) liquidation of Telco's obligations to the banks, (b) the banks', contrary to the wishes of Telco, enforcement of their legal rights as creditors, and (c) the expiration of the 10-year period. The contract expressly provides that 50 per cent of all income is to be paid to Telco and does not distinguish the sources of income. Petitioner's conclusion is that the deal was improvident and gives basis to an abnormal deduction. In effect, petitioner's position is that if the management business had continued to provide the major portion of the total income of all business done by petitioner the deduction would have been normal, but, since it was a failure, the deduction is abnormal. We fail to see any basis for petitioner's argument, as the contract expressly provides that 50 per cent of petitioner's income *from all sources* be paid to Telco. It simply received what it contracted for. While an abnormal deduction may result from an improvident contract, the deduction must be an expenditure which is not ordinary or usual for the petitioner. *Frank Shepard Co.*, 9 T. C. 913. "Abnormal" is defined by Webster's New International Dictionary as meaning "Not conformed to rule or system; deviating from the type; anomalous; irregular." Abnormality is dependent upon the facts and circumstances affecting the particular taxpayer. What would be normal for one taxpayer might be abnormal for another taxpayer and vice versa. *City Auto Stamping Co.*, 7 T. C. 354. While the contract here appears to be unusual, it had a definite purpose, which was to help Telco out of its financial troubles. The petitioner existed because of the dilemma in which Telco had found itself. The petitioner's operations from its inception were based on the 50 per cent payments to Telco. These payments were not abnormal to petitioner.

In view of the fact that the payments to Telco exceeded in each instance 125 per cent of the average of the same payments for the 4 previous years, we must determine whether or not the payments were a consequence of an increase in petitioner's gross income or a decrease in the amount of some other deduction and whether they are a conse-

quence of a change at any time in the type, manner of operation, size, or condition of petitioner's business.

Petitioner contends that the 50 per cent payment was to be based on management income and due to the fact that the insurance brokerage business furnished most of the income, the excess deduction is not a consequence of an increase in the management income. The contract provided that the payments were to be "one-half of the annual net profits earned by said Telfair * * *." Consequently, the source of the profits was not limited to management income as the petitioner contends. The payment was to be made from profits derived from any source.

In *William Leveen Corporation*, 3 T. C. 593, we noted that a tax-payer might have difficulty in establishing that an excess deduction was not a consequence of an increase in gross income in its base period, but stated that, in view of the provisions of section 711 (b) (1) (K) (ii), such a showing was necessary in order for the taxpayer to prevail.

The record shows there was an increase in petitioner's income in the base period, in that the average gross income for the base period was $170,950.13 compared with a maximum of $121,366.93 for any previous year. The gross income for the lowest year in the base period was approximately $7,500 greater than that of any year prior to the base period. We also note that the yearly payments to Telco increased from $5,015.26, the highest for any year prior to the base period, to an average of $10,797.62 in the base period.

Petitioner has not demonstrated the required lack of relationship between its increase in gross income and the excess deduction in controversy. *Horton & Converse*, 8 T. C. 487, 491.

Decision upon this issue is for the respondent.

### Issue 2. Section 722.

The petitioner filed an application for relief, July 1, 1943, on Form 991, in which it stated it was claiming relief under section 722 (b) (5).[2] It attached the following statement as grounds for relief:

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTION AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) * * * regard shall be had to the change in the character of the business under section 722 (b) (4) * * * to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this sub-

STATEMENT REGARDING FACTORS PRODUCING AN AVERAGE BASE
PERIOD NET INCOME WHICH IS AN INADEQUATE STANDARD OF
NORMAL EARNINGS FOR YEAR ENDED 2–28–43

For a ten year period ended February 28, 1942, Telfair Stockton & Company, Inc. was operating under a contract with Telco Holding Company, a Florida corporation, The Barnett National Bank, Jacksonville, Florida and The Florida National Bank, Jacksonville, Florida, whereby one-half of the profits of Telfair Stockton & Company, Inc., after providing for income taxes and dividends on preferred stock, was paid to Telco Holding Company.

The earnings for the fiscal year ended February 28, 1943 and subsequent years, are not subject to this contract. Therefore, the base period earnings, after the payment of the bonus to Telco Holding Company are not an adequate standard for determining the excess profits credit.

This claim is made on the basis that since Telfair Stockton & Company, Inc., for the fiscal year ended February 28, 1943, and subsequent is subject to taxes on its entire earnings that the base period earnings, after paying one-half of its earnings to another corporation under a contract expiring prior to the fiscal year ended February 28, 1943, are not an adequate standard of earnings for determining its excess profits tax credit. Therefore the base period earnings, before the payment of fifty per cent to Telco Holding Company are claimed.

On July 13, 1944, the Commissioner notified petitioner of the disallowance of its application for relief. On November 21, 1946, petitioner first claimed it was entitled to relief under section 722 (b) (2) when it filed, with the Field Committee on Claims for Relief Under Section 722, a statement asking relief for the same taxable year 1943 under section 722 (b) (2) and (b) (5). This new ground for relief was raised subsequent to the disallowance of petitioner's application for relief. Respondent objected to this statement being introduced as it has the effect of adding a ground for relief not considered or passed upon by the Commissioner. The statement was admitted with permission to argue its admissibility on brief. The record contains no copies of or information in regard to a claim by petitioner on Form 843 for this taxable year. On brief, petitioner requests relief under section 722 (b) (1), (2), (4), and (5).

The Court has clearly indicated in its prior decisions that it will not consider grounds for relief or supporting facts unless they have been presented to the Commissioner for his consideration prior to his rejection of the applications and claims. *Hummel & Downing Co.*, 19 T. C. 61, 64; *Blum Folding Paper Box Co.*, 4 T. C. 795; *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220; *Alexandria Amusement Corpora-*

chapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

*tion*, 16 T. C. 446; *Wadley Co.*, 17 T. C. 269. It does not appear in this case that petitioner amended its application to include a claim for relief under section 722 (b) (1), (2), and (4) prior to the denial of the claim by the Commissioner or that the Commissioner ever waived such filing or considered such claims prior to the rejection of the application for relief. We, therefore, limit our consideration to the section 722 (b) (5) factor.

In order to be entitled to the relief under consideration the petitioner is required by section 722 (a) and (b) (5) to establish (1) that the tax without relief is excessive and discriminatory and (2) "what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, * * *" The first requirement is met if the "average base period net income is an inadequate standard of normal earnings because * * * of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period * * *" and the granting of relief would not be inconsistent with the underlying principles and limitations of subsection (b).

The petitioner argues that "the earnings of the base period were adversely affected by the necessity of being required to pay a portion of those profits to another company, a source from which no income was derived." While the management business taken over by petitioner may not have been as productive of income as was expected by its officers, we do not see how this contention merits any consideration, as petitioner is by that argument taking a position which is inconsistent with and contrary to the provisions of the contract with Telco and also contrary to the affidavit of its president. It was understood by both parties to the contract that petitioner was to pay to Telco half of its profits for the right to manage Telco's properties. Petitioner's president stated that the income was to include insurance income and this arrangement was carried out for 10 years. Where parties have entered into a contract and their conduct thereunder has given construction to its terms, the court will give great weight to such construction. *Wooster Rubber Co.* v. *Commissioner*, 189 F. 2d 878. In view of this interpretation, the earnings were not adversely affected as there would not have been any earnings unless the petitioner had entered into the contract to make the 50 per cent payments.

The contract entered into between petitioner and Telco is in two parts, i. e., (1) the purchase of the real estate and insurance business for $27,500 and (2) the right to manage Telco's properties for 10 years, or less, in consideration of petitioner's paying 50 per cent of its profits to Telco. The fact that the payments which came from all of peti-

tioner's income were to be used to pay Telco's indebtedness to the banks, in effect, unites the two parts of the contract. The banks by liquidating Telco's obligations or by enforcing its creditors' rights could have severed the contract and petitioner would have been left with its real estate and insurance business. The parties agree the 50 per cent payments to Telco were properly allowed as deductions on the ground that they were ordinary and necessary business expenses. The petitioner did not acquire any rights of a fixed or permanent value in the properties managed and Telco was to assume management of the properties at the end of the 10-year period or sooner if the notes were liquidated.

The petitioner also argues that its base period earnings were not normal when compared to tax year earnings because the tax year earnings are not reduced by the factor, the 50 per cent payments to Telco. This same issue was raised in *Clinton Carpet Co.*, 14 T. C. 581. There the Court said:

> The petitioner looks at the earnings of the tax years which were earned without the payment of anything for the right to earn them and says that the actual earnings of the base period years are not proper for the purpose of comparison with those of the tax years unless the deduction taken for the cost of the right to represent American during the base years is eliminated. Unfortunately for the petitioner that is not the scheme of the statute. It does not allow the taxpayer to look at the tax years and then try to determine what would be normal earnings of those years to compare with them, but requires instead that the taxpayer look at the base years, closing its eyes to events taking place after December 31, 1939, to determine what were normal earnings of the base years. * * * A reasonable person looking at the actual earnings for the base period years could say that they were not less than normal, even though he knew that there would be no amortization deduction after 1940. * * *

It was the normal for petitioner to deduct the 50 per cent payments to Telco in the base period and it would be an incorrect interpretation of the statute to consider as normal, earnings for the base period which did not give effect to the 50 per cent payments to Telco.

Petitioner has not established that its actual average base period net income is "an inadequate standard of normal earnings during the base period." See *Park & 46th Street Corporation*, 14 T. C. 588, and *Philadelphia, Germantown & Norristown R. R. Co.*, 6 T. C. 789.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

Raum, J., dissenting: Assuming that the payments to Telco were deductible business expenses (but cf. *Vermont Transit Co.*, 19 T. C. 1040), I think that the denial of relief fails to give proper effect to the purpose of section 722, although it appears to be supported by *Clinton Carpet Co.*, 14 T. C. 581.