THE MIDVALE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31121. Promulgated March 31, 1953.

*J. Marvin Haynes, Esq.*, for the petitioner.
*George J. Le Blanc, Esq.*, for the respondent.

1220

1222

## OPINION.

OPPER, *Judge:* Regardless of other issues, petitioner must satisfy us that "a fair and just" amount to represent reconstructed base period earnings is greater than the actual credit to which it would be entitled under the excess profits tax provisions apart from section 722. In this case petitioner was automatically entitled to the benefits of the growth formula of section 713. It is not entitled to avail itself of both sections. *Homer Laughlin China Co.*, 7 T. C. 1325. It follows that unless it has shown here a reconstructed average base period net income resulting in a greater credit to it than that computed under section 713, it should not be granted the relief here claimed under section 722. *Irwin B. Schwabe Co.*, 12 T. C. 606.[1]

Although the disallowance of the claimed refund was couched in the most general terms, petitioner, relying on a previous letter from the Excess Profits Tax Council, insists that it cannot be required to support its reconstruction here because fault was found with it neither in the Council's letter nor the notice of disallowance. With this position we are unable to agree. Under section 722 (a) a taxpayer always has the burden of showing what would be the fair and just amount to represent its normal base period earnings and further that that amount is an inadequate standard of comparison. *Green Spring Dairy, Inc.*, 18 T. C. 217. Having rejected petitioner's claim there was no necessity for respondent to go further and disagree with the reconstruction.[2] Here was no such limited disallowance under 711 (b)

---

[1] Petitioner acknowledges that "the inadequacy of the actual average has been partially compensated for" by section 713 (f).

[2] Moreover, petitioner no longer claims the reconstructions sought in its applications. The 1940 application, for example, bases the reconstruction on such different facts as to cast doubt on whether the Tax Court even has jurisdiction over the years covered. That reconstruction was based on adjusted 1941 production figures and not on total ingot capacity nor finished product yield percentage. The Tax Court cannot grant relief upon the basis of facts, even though proved, which were not set forth in petitioner's claim for relief. *Block One-Thirty-Nine, Inc.,* 17 T. C. 1364; *Wadley Co.,* 17 T. C. 269; *Blum Folding Paper Box Co.,* 4 T. C. 795; see *Trunz, Inc.,* 15 T. C. 99; *Vica Co.,* 5 T. C. 535; affd. (C. A. 9) 159 F. 2d 148, certiorari denied 311 U. S. 833. While there is no need to consider the jurisdictional question, it is certain that if respondent were estopped to attack petitioner's reconstructions, it would be the reconstructions claimed in the applications. And those reconstructions petitioner has abandoned.

as appeared in *Wentworth Manufacturing Co.*, 6 T. C. 1201, and no implication that the issues were correspondingly narrow. Similarly, the questions of the extent to which demand or capacity was normal or abnormal, temporary or permanent, are matters essential to the reconstruction itself. Petitioner's burden of proof cannot be borne unless a reasonably plausible reconstructed figure for "normal earnings" appears from the record as a whole. *R. W. Eldridge Co.*, 19 T. C. 792.

Petitioner's basic contention is that it increased its productive facilities for naval orders before the end of the base period or committed itself before then to increases completed thereafter which, had they been in existence during the base period, would have resulted in largely increased earnings to it. The method of petitioner's claimed reconstruction is outlined in its brief as follows:

(a) After the completion of all plant additions acquired or committed for during the base period, petitioner had the capacity to produce and process 371,-000,000 pounds of ingots.

(b) During the base period petitioner obtained an average yield of finished products in the amount of 43.42 percent of the ingots produced.

(c) By applying this percentage to 371,000,000 pounds of ingots, there results an annual production from petitioner's expanded plant of 161,088,200 pounds of finished materials.

(d) In 1939, petitioner's rate of profit was $0.04466 per pound of finished products.

(e) By applying such base period rate of profit to 161,088,200 pounds of finished products, it is established that petitioner's base period net earnings from its changed business would have been $7,194,199.[9]

Petitioner's case accordingly rests upon the hypothesis that the increased capacity could have been utilized to supply the demand of the Navy for battleship construction. There is no suggestion that petitioner's commercial business which formed a considerable, if fluctuating, part of the total would have been any larger in the base period years even assuming the increased capacity.

In dealing with the reconstruction we must hence first discard petitioner's assumption that its total ingot production is a proper measure of the increase in capacity. For that additional ingot capacity was as susceptible of use for increased commercial business as for its ordnance orders. And in fact we know that the expanded business of the excess profits years was due to a large extent to growth in commercial

---

[9] A different figure is used as the claimed credit for 1940 since under the "variable credit" rule some of the new facilities were not in operation during that year. Petitioner computes this as follows:

$$\frac{112,880,225 \text{ (pounds of finished product in 1940)}}{161,088,200 \text{ (subparagraph (c) above)}} \times \$7,194,199 = \$5,035,940$$

It then reduces this amount by 18 per cent to $4,129,471 to reflect the average amount of income taxes which would have been paid on that amount of annual net income during the base period years, as required by section 711 (b) (1) (A) (repealed as to later years).

business.[4]  It follows that not the larger ingot production but the capacity to produce finished products in the ordnance field [5] is on petitioner's own theory the more appropriate measure of any "change" and a reconstruction based thereon.  Petitioner, itself, in criticizing respondent's contention that petitioner's business was not limited by lack of productive capacity, says: "*He has mistaken petitioner's ingot-producing capacity during the base period for its capacity to turn out finished products*" and "the limitation on petitioner's productive capacity, throughout the base period and particularly during the last base period year, was its *lack of facilities for processing ingots into finished ordnance and armor.*"  (Emphasis as in petitioner's reply brief.)

Concentrating then on finishing capacity we find the significant claimed expansion lies in the facilities for production of armor plate. In this area, petitioner contends for a demonstrated increase to 1,700 tons a month.  Here, however, there is some question resulting from petitioner's own contemporary statement regarding 700 tons of that increase.  As our findings show, shortly after the end of the base period and while the facilities were apparently still under construction petitioner in order to avail itself of the benefits of contemporary depreciation deductions represented to respondent that "* * * these additional and special armor producing facilities could not economically take the place of existing facilities as the latter wore out, nor would we have installed them at the present time for the purpose of replacing existing equipment in the future.  After these facilities have served their purpose of making possible the essential deliveries they will be either totally or partially useless to this Company upon the completion of the present Navy Shipbuilding Program."  And that this program was regarded by petitioner and the Navy as an emergency of a short-lived, temporary,[6] and abnormal nature appears

---

[4] Petitioner's commercial and ordnance production for the years 1936 through 1941 is shown by the following table:

| Year | Pounds of product shipped | | |
| --- | --- | --- | --- |
| | Ordnance | Commercial | Total |
| 1936 | 6,382,621 | 46,927,835 | 53,310,456 |
| 1937 | 4,005,171 | 63,329,966 | 67,335,137 |
| 1938 | 15,666,228 | 33,295,493 | 48,961,721 |
| 1939 | 20,229,092 | 53,653,613 | 73,882,705 |
| 1940 | 39,289,544 | 73,590,481 | 112,880,025 |
| 1941 | 54,674,499 | 117,307,111 | 171,981,610 |

[5] As petitioner itself states: "* * * *processing* facilities for commercial products could not be used for ordnance products * * *." [Emphasis as in petitioner's reply brief.]

[6] In attempting to distinguish *National Grinding Wheel Co.*, 8 T. C. 1278, petitioner relies, among other points, on the fact that there "there was no * * * proof that as a result of the additional capacity a higher level of earnings of a *permanent character* had been established * * *."  (Emphasis added.)

from other contemporary statements. For example, in the same letter and apparently referring to a conference held with respondent's representative a short time previously, petitioner states: "we proposed at the conference that the last mentioned amount ˙[that is, cost less salvage] be amortized at a rate per ton of armor shipped, based on the total tonnage of armor covered by existing contracts which the Midvale Company has for armor for battleships Nos. 57, 60, 61 and 62, and CV 8. This tonnage is approximately 25,766 gross tons, which * * * is to be included as an item of cost on work performed and charged off on our books monthly for armor shipped." [7] On September 1, 1939, the Chief of the Bureau of Ordnance, United States Navy, wrote petitioner: "An exigency of the service exists to expedite the Navy shipbuilding program in the cause of National Defense." The letter related to a lease of equipment for the installation of which part of the expenditures involved were used. In the lease, dated March 12, 1940, the parties again recite: "WHEREAS, there exists an exigency of the service to expedite the Naval Shipbuilding Program in the cause of National Defense; and WHEREAS, the delivery of the Armor for the above-mentioned vessels in the minimum time is urgently necessary to expedite completion of the aforesaid vessels * * *."

We need not speculate as to the reason for the time at which petitioner's expansion in its ordnance finishing capacity was ultimately completed. Whether it was because demand limited capacity rather than capacity limiting demand as petitioner apparently contends by its statement that "Alert businessmen do not lag four years behind demand * * * in undertaking plant expansions"; whether it was because petitioner was reluctant to undertake government work; or whether it was because petitioner was unwilling to commit itself until the war conditions became certain, is of no concern. The fact remains that almost two-thirds of this expenditure was not authorized until after petitioner received the expediting letter from the Chief of the Bureau of Ordnance, which in turn was written on the very day the war in Europe commenced.

Under these circumstances, it is doubtful whether the increase from 1,000 to 1,700 tons per month capacity referred to in those documents did represent a permanent increase in capacity (since it was for a limited purpose), did contribute to petitioner's "normal" earnings,

---

[7] It is true that petitioner further proposed a readjustment of such claimed amortization, but that was conditional only in the event it received additional Navy contracts in the future.

and can form a part of any reconstruction. See *Avey Drilling Machine Co.*, 16 T. C. 1281, 1300; *Crowncraft, Inc.*, 16 T. C. 690.

As to ordnance other than armor, petitioner has not shown how greatly its facilities for the production of guns and projectiles were changed, but it appears that the expenditures exclusively for these purposes were made to the extent of about one-half, early in the base period, and that the total of such expenditures form a slight portion of the entire claim for expansion generally.[8] If there was any increase, we conclude that it was relatively insignificant and hence has not been shown to have been of sufficient magnitude to alter the conclusion to which the remainder of the record would otherwise compel us.

Generally speaking, the statute itself prohibits consideration of post-1939 events, except to a limited extent, in connection with cases governed by the last sentence in section 722 (b) (4) and (c). *Southern California Edison Co.*, 19 T. C. 935. Cf. *7-Up Fort Worth Co.*, 8 T. C. 52, 66; *Wisconsin Farmer Co.*, 14 T. C. 1021, 1032. But even if we examine such events to the fullest extent, beyond the permissible limits of section 722 (a), a comparison would not help petitioner here any more than it did in *Industrial Supplies, Inc.*, 18 T. C. 1067. Thus, if, notwithstanding the statutory scheme, the total ordnance shipments for the 4-year period 1938 through 1941 were used as a basis of computation[9] the total ordnance products shipped would be some 130,000,000 pounds. Adding average commercial shipments for the base period years which form no part of petitioner's claimed increased capacity, total poundage for the recon-

---

[8] In terms of completed cost, the following schedule shows the year of completion of petitioner's claimed increase in productive and processing facilities:

| | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|---|---|
| Modernization of projectile and gun-producing facilities | $12,698 | $120,482 | $1,403 | $60,601 | $54,230 | ---------- |
| Additional and special armor-producing facilities | ---------- | ---------- | ---------- | 346,379 | 701,829 | ---------- |
| Productive facilities other than armor | ---------- | ---------- | ---------- | ---------- | 397,517 | $162,200 |
| Repair expenditures on ordnance facilities | 319,227 | 473,038 | 497,506 | 660,727 | ---------- | ---------- |
| Additions to plant property and equipment | 538,824 | 528,736 | 190,940 | 248,129 | ---------- | ---------- |
| Allocation of $194,597 expended during the base period for new requirements for armor plate over the years 1936–1939 | 48,649 | 48,649 | 48,649 | 48,649 | ---------- | ---------- |
| Total by years | $919,398 | $1,170,905 | $738,498 | $1,364,485 | $1,153,576 | $162,200 |

[9] As petitioner itself says: "the unit of profit figures for 1942 to 1944, inclusive, would not be comparable with the unit of profit figure for 1939."

structed 4-year period would be some 327,000,000 or an annual average of approximately 81,800,000 pounds.[10]

Our findings show that the average profit per pound of ordnance material produced during the base period was approximately $.0345 which, assuming all of the increased capacity could have been sold at a similar profit,[11] would result in reconstructed net income of $2,822,100. For all years after 1940 petitioner, invoking section 713, used an average base period income credit of $3,100,685, or substantially in excess of this reconstruction. And for the year 1940 its reconstruction is admittedly to be reduced by 18 per cent (the amount of income tax payable for that year, section 711 (b), repealed as to later years).[12] Its reconstructed income for that year would accordingly amount[13] to only $2,314,122 compared to its section 713 credit for 1940 of approximately $2,500,000.

In any event, the permissible reconstruction without the prohibited recourse to post-1939 events shows that no relief is warranted. Thus,

[10]

| Year | Pounds of product shipped by petitioner | | |
|---|---|---|---|
| | Ordnance | Other | Total |
| 1936 | | 46,927,835 | |
| 1937 | | 63,329,966 | |
| 1938 | 15,666,228 | 33,295,493 | |
| 1939 | 20,229,092 | 53,653,613 | |
| 1940 | 39,289,544 | | |
| 1941 | 54,674,499 | | |
| Totals | 129,859,363 | 197,206,907 | 327,066,270 |
| Annual average | 32,464,841 | 49,301,727 | 81,766,568 |

[11] In attributing to petitioner a constructive profit of $.0345 per pound of product, there seems to be a considerable weighting in petitioner's favor. During the base period years the Vinson-Trammell Act limited profits to 10 per cent on Navy business. Petitioner's price per pound for the four base period years was about $.35, $.37, $.33, and $.32, respectively, or an average of a little over $.34 which if limited to 10 per cent would give an average profit or a little over $.034. However, the year of largest price was 1937, in which a comparatively small amount of Navy business was produced and the year of smallest price was 1939, in which the largest amount was produced so that on a weighted average an even lower profit would result. It is true that the Vinson-Trammell Act limitation was suspended by the Second Revenue Act of 1940, and not effective in the years 1940 and 1941. But the suspension of the 10 per cent limitation was directly related to the enactment of the Excess Profits Tax provisions which were presumed to take its place. See Report, Ways and Means Committee, H. Rept. No. 2894, 76th Cong., 3d Sess., p. 2. And the excess profits tax in turn was the result of war conditions and defense preparations. To antedate that into the base period years would be as inadmissible as any other assumption that the war conditions had been effective earlier than the facts justify and equally inadmissible. *Fezandie & Sperrle, Inc.*, 5 T. C. 1185.

[12] SEC. 711. (b) TAXABLE YEARS IN BASE PERIOD.

(1) GENERAL RULE AND ADJUSTMENTS * * * the following adjustments shall be made * * *:

(A) Income Taxes.—The deduction for taxes shall be increased by an amount equal to the tax * * * for such taxable year under Title I or Chapter 1, as the case may be, of the revenue law applicable to such year.

[13] This is without taking into account a further reduction conceded by petitioner to be required by the "variable credit" rule because some of the new facilities were not in operation during 1940. See footnote 3, *supra.*

even if we grant petitioner all of its proven increase in finishing capacity, namely, that relating to armor, including that capacity which may well have been abnormal, it would still not result in a reconstruction in excess of the credit computed under section 713 (f). Seventeen hundred tons of armor per month or 40,800,000 pounds per year, at an average 1939 price of approximately 32 cents per pound[14] would result in $13,056,000 of armor sales. Subtracting the $3,831,067 worth of armor actually sold in 1939, we could obtain increased armor sales of $9,224,933. Application of the 10 per cent limitation in the Vinson-Trammell Act which was a condition of the base period[15] would yield a profit no greater than $922,493 which when added to petitioner's actual 1939 profit of $3,300,139 would result in a reconstructed 1939 profit of $4,222,632.

When constructive earnings throughout the base period are shown not to be subject to material variations from year to year, the 1939 reconstruction may be taken as the constructive average base period net income. *7-Up Fort Worth Co., supra; Del Mar Turf Club*, 16 T. C. 749. On the other hand, where such variations may reasonably be expected to occur within the base period, reconstructed 1939 earnings must be backcast by an appropriate index over the earlier base period years in order to get average reconstructed base period net earnings. E. P. C. 13, 1947–1 C. B. 83; *Alexandria Amusement Corporation*, 16 T. C. 446; see *East Texas Motor Freight Lines*, 7 T. C. 579. Since the latter situation is typical of most taxpayers' experience, 1939 reconstructed earnings can be used for the base period average only where the lack of significant variation is clearly established. E. P. C. 13, *supra;* see *Tober-Saifer Shoe Manufacturing Co.*, 17 T. C. 1042. We deem that the lack of significant variation has not been clearly established[16] and that backcasting on some index is therefore required.

Petitioner's own experience is the preferable index for such backcasting. E. P. C. 8, 1947–1 C. B. 73; see *Avey Drilling Machine Co.*, *supra,* at 1300. Not only has petitioner the burden of proving some other index more appropriate, *Jefferson Amusement Co.*, 18 T. C. 44, 58, but petitioner itself contends that in the event backcasting is found necessary its own experience be considered "the most accurate index."

---

[14] Since the proposed reconstruction proceeds with 1939 as its premise, we have employed 1939 figures. Other permitted methods would not result in a significantly more favorable reconstruction nor be effective to grant petitioner any relief.

[15] See footnote 11, *supra.* See also *Alexandria Amusement Corporation*, 16 T. C. 446.

[16] The record in fact contains evidence of variations within the base period. The following schedule demonstrates a few of these variations:

| Commercial sales as compared with ordnance sales: | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Commercial | $5,976,130 | $9,098,794 | $5,059,110 | $6,955,099 |
| Ordnance | 2,246,835 | 1,483,205 | 5,194,971 | 6,413,383 |
| Compensation of officers | 186,552 | 197,621 | 154,918 | 176,669 |
| Interest payments | | 1,298.13 | 104.02 | 28,622.58 |
| Net profit per pound | .02751 | .02677 | .03906 | .04466 |
| Profit on completed government contracts | 82,160.33 | 341,131.68 | 83,821.25 | 226,165.21 |

Petitioner's effort, however, to superimpose the growth formula of section 713 on the index of its own experience we regard as doomed to failure.[17] E. P. C. 8, *supra*, on which petitioner relies refers, it is true, to a taxpayer's actual experience as a valid index. But it would be inconsistent to vary that actual experience by further unreal hypotheses such as the growth formula, and in theory, we think, would do violence to the rule of *Homer Laughlin China Co., supra; Stimson Mill Co.*, 7 T. C. 1065, affd. (C. A. 9) 163 F. 2d 269, certiorari denied 332 U. S. 824; *Dowd-Feder, Inc.*, 10 T. C. 345, affd. (C. A. 6) 173 F. 2d 673.

If we use petitioner's experience by itself as our index for backcasting, an approximate average reconstruction of only $2,671,000 would result.[18] This again is substantially less than the credit of $3,100,685 computed under section 713 (f) for 1941 and subsequent years, and if the necessary adjustment for corporate income tax were made,[19] would also be less than the credit used for 1940 of about $2,500,000. We have used round figures and possibly arrive at an amount only approximately correct. But the difference is so great that any omissions or errors in computation cannot be but equalized by the excess.

Although the foregoing is based upon the theory of reconstruction advanced by petitioner, we have analyzed other possible methods of reconstruction, see, e. g., E. P. C. 13, *supra*, and find that none of them results in a reconstructed average adequate to entitle petitioner to relief under section 722.

Assuming, therefore, that petitioner has shown some change in the conduct of its business so as to fall within the provisions of section 722 (b) (4), a question we need not now decide; and assuming further that the increased production would all have been sold under normal conditions during or by the end of the base period, a conclusion strenuously resisted by respondent; we conclude that petitioner has

[17] Nor would it be correct to use reconstructed 1939 earnings for both the years 1938 and 1939 in such backcasting. E. P. C. 31, 1948–1 C. B. 93.

[18]

| Year | Petitioner's excess profits net income | Index | Reconstructed earnings |
|---|---|---|---|
| | | | (% of reconstructed 1939) |
| 1936 | $1,419,574 | 43.0 | $1,815,631 |
| 1937 | 1,742,702 | 52.8 | 2,229,549 |
| 1938 | 1,888,200 | 57.2 | 2,415,345 |
| 1939 | 3,300,139 | 100.0 | 4,222,632 |
| Total | | | 10,683,157 |
| Annual average | | | $2,670,789 |

[19] Reduced for 1940 by at least 18 per cent to $2,190,220. See footnotes 12 and 13, *supra*.

failed to show that the tax computed with the benefit of section 713 is excessive or discriminatory, or that a fair and just amount representing normal earnings would be greater than that to which the statute without the application of section 722 entitles it.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*