OPINION. FisheR, Judge: The petitioner claims excess profits tax relief both under sections 722 (b) (2) and 722 (b) (4), Internal Revenue Code of 1939. It contends, under subsection (b) (2), that its base period income was depressed by “temporary economic circumstances.” Under (b) (4), it contends that there were substantial base period changes in the management and operation of the business which resulted in a higher level of earnings during the later years of the base period, but that the business had not reached the level it would have attained if the changes had been made 2 years earlier. The respondent’s position is that petitioner’s depressed base period earnings were not due to any temporary economic circumstances within the meaning of section 722 (b) (2) but resulted from bad management and unsound internal policies. He denies that there were any substantial base period changes in the management or operation of the business within the meaning of subsection (b) (4). He states in his brief that petitioner’s low base period earnings were due “to internal conditions in the company, namely, a failure to maintain the rate of gross profit previously enjoyed prior to the base period and its failure to properly control its expenses,” citing Foskett & Bishop Co., 16 T. C. 456; Toledo Stove & Range Co., 16 T. C. 1125; and Granite Construction Co., 19 T. C. 163. To begin with, it is clear (and respondent does not deny) that petitioner’s base period earnings were depressed. Its average net income for the 13-year period, 1922 to 1934, inclusive, was .$1,374,925. The lowest net income for any year of that period, 1934, was $543,228.64. Petitioner’s actual average base period net income was $237,262.34. Its average base period net income for use in computing excess profits credit under section 713, Internal Revenue Code of 1939 (without the benefit of section 713 (f)), was $153,472.85, and under section 713 (f) was $530,227.43. Petitioner’s base period depression actually began in 1934 or 1935. It had a net income in 1935 of only $132,108.90. In 1933, its net income was $1,661,168.08. We think the record supports the view that the depressed base period earnings were in the main attributable to the following factors: (a) Criticism asserting that petitioner’s toothpaste had harmful effects on tooth enamel appearing in several books and articles, and the spreading of unfavorable stories by unfriendly druggists and salesmen for competitors; (b) complaints from druggists and retail customers about the separation and hardening of the toothpaste accompanied by returns of tubes and demands for refunds; (c) antagonism of druggists and other outlets because of sales policies, including withdrawal on advice of counsel from operation under fair trade laws in 1935; and (d) the loss of effectiveness as a medium of advertising of the Amos ’n’ Andy radio program. Since we hold, infra, that petitioner has qualified for relief under section 722 (b) (4), it is unnecessary under the circumstances of the instant case for us to determine whether any of the factors depressing earnings was a basis for qualification under (b) (2). After our determination of normal earnings in relation to (b) (4), there is no basis under these circumstances for separate and additional relief under (b) (2). We turn, therefore, to a consideration of qualification under (b) (4). We think the record supports the view that a significant change in management emerged from the successive events which included Luck-man’s employment as sales manager in the fall of 1935, his advancement to vice president in charge of sales in 1936, the arrangement putting him in charge of advertising as well as sales in 1937, and finally his appointment as general manager as well as vice president in 1938, at which time he was put in practical control of the business subject only to supervision by Smith. The active management was left largely to Luckman. Promotions and employment of new key personnel were likewise made from time to time. Such changes cannot be evaluated separately, but must be kept in mind in integrating their effect with the changes in operations considered infra. Our findings set forth the facts concerning the attacks upon and criticisms leveled at petitioner’s toothpaste. These attacks and criticisms arose from many sources. To counteract them, a number of experiments were made and successive formulae developed, but they proved unsatisfactory for various reasons. In June 1936, a new formula, No. 85, was adopted to prevent separation and hardening of toothpaste. In April 1937, Formula 99 was adopted for both toothpaste and toothpowder. Its main objective was to eliminate decalcify-ing effects. It also included a detergent registered under the trade name of Irium which supplied the toothpaste with a foaming agent which was an important factor from the customer’s perspective. This formula was used for the balance of the base period (and until June 1941). The adoption of Formula 99, eliminating decalcifying effects and supported by reports of laboratory tests and experiments, was of basic importance in counteracting criticism of petitioner’s toothpaste ; and the American Dental Association, an important and powerful critic of petitioner’s product, finally approved the formula in November 1939, as an acceptable dental remedy. Our findings likewise refer to the complaints from retail druggists about the loss leader sales practices of certain chain stores and department stores. As a result, fair trade laws were enacted in four jurisdictions, including California, to prevent these practices. Petitioner entered into fair trade contracts in California during 1933. In July 1935, petitioner was advised by counsel that, because of the antitrust laws, there was doubt as to the legality of forced compliance with fair trade contracts by a corporation engaged in interstate commerce. As a result, petitioner, during the same month, notified the California retail trade that it was withdrawing from further operation under the Fair Trade Act. Following this announcement, many retail druggists began to boycott petitioner’s products. In September 1935, the National Association of Retail Druggists held its convention, and a resolution was offered to condemn petitioner for its price policies and to extend the boycott on a nationwide basis. Luckman (who had advance information as to the contemplated action) and Hoffman attended the convention, and stated that petitioner would adhere to fair trade practices and do whatever it could to stop price cutting of its products. A contribution of $25,000 was offered on behalf of petitioner as the nucleus of a fund to seek national legislation to legalize fair trade practices. The contribution was accepted and the resolution of censure, which would have been very damaging, was withdrawn. After the N. A. R. D. convention, Luckman made an extended tour of the United States, visiting druggists and other sales outlets in relation to fair trade practices. He cut off sales to Macy’s and several other retailers vliich refused to agree not to cut prices. This action was temporarily harmful to the business but its ultimate effect was to build goodwill with the smaller retail outlets which opposed price cutting in that it demonstrated to them that petitioner intended in fact to comply with fair trade practices. In May 1936, as a means of controlling retail prices of its products, petitioner limited the wholesale sale of its products to about 330 selected wholesalers (out of about 1,100 wholesalers in the United States) under agreements following the del eredere plan described in our findings. Here again the purpose, harmful initially, contributed to the establishment of petitioner’s intent to go along with fair trade practices. In August 1937, the Miller-Tydings Act was passed exempting from the antitrust laws contracts made pursuant to fair trade laws. Thereupon, many additional States passed fair trade acts, and by the end of February 1938, petitioner had entered into such contracts in about 40 States, thus complying with its previously expressed intent. The adoption of the del credere plan and the various other steps taken to comply with fair trade practices were largely under Luck-man’s direction. Beginning in 1934 (when petitioner had a regular sales force of not over 10 salesmen) petitioner began reorganizing its sales force and, by 1939, had over 100 salesmen organized under 9 division managers and 30 to 40 district managers^ contacting both wholesalers and retailers in their districts. Much of this development was under Luck-man’s direction. Advertising was a very important factor in promoting petitioner’s sales. While radio was only one medium, it was highly significant. This is amply demonstrated by results during both the period of great effectiveness of the Amos ’n’ Andy show as a sales promotion medium for petitioner and the period of its loss of such effectiveness. The Bob Hope show proved to be a valuable successor, but, while growing in effectiveness through 1939, it had not reached its normal level of effectiveness by the end of the base period. It is apparent that some such medium of advertising was a vital necessity for sales promotion of products of the nature of petitioner’s. The Amos ’n’ Andy show was discontinued by petitioner in December 1937 and Bob Hope was engaged in October 1938. Luckman did not personally select Bob Hope, but was active in shaping the nature of the show as an advertising medium. We have reviewed the changes in management and operations in some detail because we think they must be taken in the aggregate and integrated in assessing the results which they produced during the base period and in indicating the potential increase which would have resulted if the changes had been made 2 years earlier. We think that they qualify petitioner for relief under section 722 (b) (4). A consideration of the whole record demonstrates that they were largely responsible for the increased earnings in 1938 and 1939, and that the level of these earnings would have been materially higher at the end of 1939 if the aggregate, significant changes had been made 2 years earlier. On the question of determination of constructive average base period net income, we have given careful consideration to the reconstruction of earnings for 1939, and in doing so, we have given such weight to the push-back rule in relation to dentrifrices as we deemed appropriate in order to determine the level which such earnings would have reached under base period conditions by the end of 1939 if the changes appropriately considered under the push-back rule had been made 2 years earlier. We have likewise given consideration to back-casting techniques in order to reach average constructive dentifrice earnings for the entire base period. We do not think the evidence warrants application of the push-back rule to antiseptics although we have otherwise given consideration to antiseptics in our reconstruction. Petitioner claims a constructive average base period net income of $1,304,472.25. Upon the record, we think it is clear that this amount is highly excessive. On the other hand, we think that respondent’s position that there is no basis for a reconstruction which would give relief in excess of the credit of $530,227.43 under section 713 (f) is also erroneous. Upon consideration of the entire record, and applying our judgment in integrating the numerous factors involved, we have determined a constructive average base period net income of $646,000. In reaching this conclusion, we do not suggest that we have achieved precision where precision is impossible. Constructive average base period net income need not be determined with mathematical exactness. Danco Co., 17 T. C. 1493. If the rule were otherwise, it would presuppose a burden of proof resting upon petitioner which it would find impossible to meet in cases of this type and would be wholly inconsistent with the relief objectives of section 722. Reviewed by the Special Division. Decisions will he entered under Bule 50.