TANKPORT TERMINALS, INC., SUCCESSOR IN INTEREST TO FORMER TANKPORT TERMINALS, INC., NOW DISSOLVED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34136.   Filed June 27, 1957.

*Jacquin D. Bierman, Esq.*, and *Richard S. Helstein, C. P. A.*, for the petitioner.

*Maurice S. Bush, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner denied the petitioner's claims for excess profits tax relief under section 722 of the Internal Revenue Code of 1939, for the fiscal years ended April 30, 1944, 1945, and 1946.

We must decide whether the petitioner is qualified for such relief by reason of the fact that it commenced business during the base period or was committed prior to January 1, 1940, to a change in capacity of its business and allegedly did not reach by the end of the base period the earning level it would have reached had it commenced business or changed its capacity 2 years before it did so, and if we decide that question in favor of the petitioner, then we must determine the petitioner's constructive average base period net income resulting from such qualification.

FINDINGS OF FACT.

Tankport Terminals, Inc., organized on May 12, 1954, is the successor in interest in this proceeding to former Tankport Terminals, Inc. (hereafter referred to as Tankport), now dissolved.

Tankport filed its income and excess profits tax returns on the basis of a fiscal year ended April 30.   Its excess profits tax returns for the

years ended April 30, 1944, 1945, and 1946, were filed with the collector of internal revenue for the fifth district of New Jersey.

Rupert Lewis, an attorney, entered the oil business in 1929 when he did legal work in connection with the construction of a public deepwater terminal in New Orleans by the General American Tank Car. Co. (hereafter referred to as GATX). He was active in the construction and operation of the terminal and became vice president of General American Tank Storage & Terminal Co. (hereafter referred to as General American), a subsidiary of GATX. In 1933 General American sent Lewis to New York to take charge of opening an ocean public storage terminal in New York Harbor. He purchased for General American the terminal of the American Mineral Spirits Co. (hereafter referred to as Amsco) at Carteret, New Jersey. This was the first deepwater public storage terminal in New York Harbor.

In 1937 Lewis felt that General American had reached its peak and he left it to open his own public terminal. Lewis thought that if he could build a terminal he could find customers to use it. The main difficulty was in finding a proper location for the terminal. Lewis wanted a site within the free lighterage limits set up by the railroads, i. e., within incorporated municipalities. Also, a New York City ordinance which did not permit erection of large storage tanks above the ground forced Lewis to look for a site on the New Jersey side of the harbor. However, on the New Jersey side, the Palisades run into the Hudson River, ending in shelves of heavy igneous rock under shallow water, and south of the Palisades are marshlands which would necessitate reinforced pile foundations for storage tanks.

During the summer of 1937 Lewis negotiated for the purchase of property in Jersey City from the Lehigh Valley Railroad Co., but was refused zoning permits from the city. In connection with these negotiations he obtained bids from 3 tank builders for the erection of storage tanks on that property with a capacity of approximately 500,000 barrels.

Shortly thereafter, in August, September, and October 1937, Lewis negotiated with the Standard Oil Company of New Jersey (hereafter referred to as Standard Oil) for the purchase of part of its Eagle Works property in New Jersey which it was attempting to sell. The Standard Oil property was desirable because it had a belt railroad; it had foundations for erecting at least 1,000,000 barrels of storage capacity; it had pipelines, a pumphouse, manifolds, and other items necessary for a terminal; it had a deepwater channel available to it; and no rezoning would be required in order to erect the terminal.

Lewis applied for and received building permits for the erection of storage tanks and other improvements and for the restoration of tanks on all of the available foundations on the Standard Oil property aggregating 1,000,000 barrels capacity.

On October 20, 1937, Tankport was incorporated under the laws of New Jersey, for the purpose of owning and operating a deepwater storage terminal for the handling of bulk liquid products, principally petroleum.

Lewis, Herman Van Cleve, Sidney Tonner, and Clarence Miller were Tankport's principal stockholders at the time of its incorporation. Van Cleve was one of four stockholders and the manager of the Maritime Petroleum Corporation (hereafter referred to as Maritime), a company engaged in the purchase and sale of fuel oils. Tonner was a one-half owner of the Spentenbush Fuel Transport Service (hereafter referred to as Spentenbush) and a one-fourth owner of Maritime. Spentenbush was a major operator of fuel oil barges within the New York Harbor area. Miller was engaged in the petroleum business in Pennsylvania at the time of Tankport's incorporation.

On January 12, 1938, Tankport executed a purchase agreement with Standard Oil for a part of its Eagle Works property, comprising approximately 17 acres of land, together with all buildings, improvements, pipelines, fixtures, and appurtenances thereto and 5 tanks (Nos. 154, 155, 156, 165, and 282) located on an adjacent 2½-acre tract of land.

In addition Standard Oil assigned to Tankport certain rights-of-way with the Lehigh Valley Railroad Co. including the use of a dock and deepwater channel. On March 24, 1938, the purchase was consummated and a deed was executed from Standard Oil to Tankport. Standard Oil also agreed to sell to Tankport live steam for pumping.

On January 12, 1938, Standard Oil leased to Tankport for 3 years, the 2½-acre tract of land on which the 5 tanks mentioned above were located. Standard Oil had agreed to turn over to Tankport ready for cleaning, tanks 154, 155, 156, and 165 on or about January 15, 1938, and tank 282 no later than April 1, 1938. In lieu of cleaning the tanks Standard Oil was to furnish Tankport with certain facilities and service and to allow Tankport $2,000 for the cleaning. Standard Oil also agreed to make available to Tankport foam for fire protection of the leased premises.

On July 28, 1939, Standard Oil served Tankport notice that after October 1, 1939, it could no longer provide Tankport with the utilities agreed to above. This forced Tankport to install its own electrical power equipment.

After purchase of the Standard Oil property Tankport constructed 4 pipelines from the dock to a connecting point on its property and 3 pipelines from the connecting point to the pumphouse. The fourth pipeline from the connecting point to the pumphouse had been acquired with the purchase of the property. Each pipeline was about 1½ miles long. These pipelines were designed to serve a terminal with a capacity of at least 1,000,000 barrels. Construction of the

pipelines lasted through May 1939, and cost approximately $40,000. It was much more economical to build the 4 pipelines at once than to construct them separately as the capacity of the terminal increased.

One of the pipelines was intended for specialty business, i. e., products other than petroleum products. Terminal charges for specialty products averaged from 50 to 100 per cent higher than the rates for petroleum products. All of the pipelines could be cleaned and thus used interchangeably for different products.

In addition, Tankport constructed tank car loading and unloading racks, a switch track siding, truck transport loading racks, manifold systems, foam equipment, foam storage, foam pumps, powerlines, and transformers. Tankport also had to trace the buried pipelines it purchased from Standard Oil since it had no way of identifying them. These construction activities were carried on during 1938 and 1939 at the same time that the terminal was in operation.

Tankport had to clean the 5 tanks that it purchased from Standard Oil. Tanks 156, 165, and 282 had been used as "slop tanks," i. e., the residue of the refining processes was stored in them. The Solvents Process Corporation was employed to clean them, but their equipment and process did not operate satisfactorily and the cleaning was subsequently done by the Sludge Removal & Reclaiming Corporation. They became ready for storage on September 1, August 17, and November 1, 1938, respectively. Tank 154 was available for storage on May 1, 1938, and tank 155 was available on July 1, 1938.

On March 10, 1938, Tankport contracted with the Hammond Iron Works (hereafter referred to as Hammond) for the construction of tanks 1 and 2 which had capacities of approximately 83,000 barrels each. The tanks were erected and were available for storage on May 1 and September 1, 1938, respectively. The cost of the tanks was $48,737 to be paid $5,000 upon execution of the contract and the balance in 30 equal monthly installments after completion of the tanks.

Late in the summer of 1939 Lewis discussed leasing tankage to the First National Oil Corporation which was negotiating a long-term contract with the Mexican Government to bring oil to the New York Harbor. Shortly thereafter Lewis attempted to order from Hammond 3 additional tanks with a capacity of 55,000 to 57,000 barrels each, but Hammond would not accept the order due to the uncertainty of conditions resulting from the outbreak of World War II in September 1939.

Tankport was also unable to obtain tanks from other manufacturers at that time.

On December 6, 1940, Tankport contracted with Hammond for the construction of tanks 3 and 4 with a capacity of approximately 55,000 barrels each. The price of the tanks was $41,710 to be paid $2,500

upon execution of the contract and the balance in 24 equal monthly installments after completion of the work. Hammond did not commit itself to any firm delivery date. Tank 3 was available for storage on June 15, 1941, and tank 4 was available for storage on August 28, 1941.

Tankport attempted to contract with Hammond for the construction of tank 5 with a capacity of approximately 57,000 barrels, at the time it contracted for tanks 3 and 4, but Hammond would not make such a contract because it had only a limited supply of steel available to it. On May 9, 1941, Tankport contracted with Hammond for the construction of tank 5, but it did not become available for storage until July 5, 1942.

On September 12, 1939, Tankport acquired tank 304 from the Hudson Iron and Metal Company. In moving the tank to its 17-acre plot the tank was damaged. It was not until August 28, 1940, that the tank had been repaired and was ready for storage.

In January 1939, Tankport agreed to store bunker fuel oil, brought in by tanker, for the Asiatic Petroleum Corporation (hereafter referred to as Asiatic). Asiatic had no vacant storage space in its own terminal and the situation was an emergency. Bunker oil is an end residual petroleum product. It is an extremely heavy, thick oil and a difficult product to handle. Because of its heavy, asphaltic characteristics, bunker oil must be preheated before it can be pumped into or out of a storage tank. This preheating is required regardless of the time of year the product is moved. Steam coils are required around tanks in which bunker oil is stored to keep it from solidifying.

To avoid the danger of a freezeup or plug-up of bunker oil in a pipeline due to solidifying during the pumping process from tanker to terminal storage tank, the exposed or aboveground portion of the terminal's pipeline must be wrapped with a steam line alongside the product line. In addition there should be a wrapped tracer line to take care of the exhaust of the steam in the steam line. Finally, the exposed line must be heavily insulated. Tankport was not equipped with these auxiliaries at the time it agreed to store the bunker oil for Asiatic. Lewis was aware of the need for such auxiliary equipment and was hesitant about receiving bunker oil without it. However, Asiatic's engineers surveyed the situation and recommended that the tanker be unloaded. Tankport assumed no liability for taking the bunker oil into its tanks.

Asiatic was an affiliate of the Shell Oil Company (hereafter referred to as Shell), one of Tankport's customers. Tankport agreed to store the bunker oil for Asiatic as a favor to Shell though ordinarily it would not handle bunker oil.

Asiatic's proposed lease covered tanks 155, 156, and 165, with storage capacities of approximately 40,000, 40,000, and 15,000 barrels, respectively. Tank 155 had been rented to Maritime for the period July 1, 1938, to May 1, 1939. The lease was canceled by consent of the parties to make way for the bunker oil, and its contents were transferred to tank 282. Tankport agreed not to charge Maritime any rent for the use of tank 282 until May 1, 1939.

The tanker arrived on January 31, 1939, and commenced pumping the oil. The pumping continued until early in the morning of February 1, 1939, when a freezeup of the oil occurred in the exposed, aboveground portion of the pipeline due to loss of heat in transmission.

Tankport tried to unfreeze the pipeline by applying steam thereto, from a rented switch engine, through a valve connection in the buried part of the pipeline. This caused 5 of the couplings holding lengths of the exposed pipeline to become disconnected. Asiatic then canceled its lease and took its bunker oil elsewhere for storage. As a result of the freezeup, 1 pipeline and tanks 155, 156, and 165 became temporarily unavailable for use of any kind.

On February 21, 1939, while the pipeline was undergoing repair, Tankport negotiated a contract with the Barrett Co. for the use of tanks 156 and 165 for 6 months for storage of a specialty product. However, Tankport was unable to clear the pipelines in February and was forced to cancel the Barrett Co. contract.

Tankport waited for hot weather to warm the ground so that the bunker oil in the buried pipeline, which was surrounded by concrete, would become greasy and could be blown out of the pipeline. Tankport tried to blow the oil out of the line every few weeks, but it was not until May that it was successful. The tanks themselves had frozen bunker oil in them and they had to be cleaned by removing the sides and shoveling the oil out. The cleaning was not completed until June or July 1939. The total repair bill for the damage done by the freezeup, including steam charges, was about $1,550.

Tanks 1 and 154 became available for storage on May 1, 1938. However, Tankport did not expect to commence operations until the fall of that year since many of its other facilities would not be ready until then. Shell was in need of storage space in the spring of 1938 and as a favor, tanks 1 and 154 were rented to it commencing May 1, 1938. It was agreed that Shell would not try to withdraw the oil until Tankport had constructed facilities for loading out material. These 2 tanks were fully rented from May 1, 1938, through April 30, 1942.

Tank 155 became available for storage on July 1, 1938. At that time it was leased to Maritime for the storage of kerosene. In January 1939 this kerosene was moved to tank 282 to make room for the

bunker oil to be received from Asiatic. Due to the freezeup of the bunker oil, tank 155 was not available for storage until June 1939. It remained vacant until September 7, 1939, when it was rented to Shell. It was fully rented from that time through April 30, 1942.

Tank 165 became available for storage on August 17, 1938. At that time it was leased to Suburban Fuel Oil and then to High Point Oil Terminals. The latter's lease expired in December 1939. The tank was then leased to Asiatic, but due to the freezeup of bunker oil it was not available for storage until June 1939. It was then rented to Shell and remained fully rented through April 30, 1942.

Tank 282 was available for storage on November 1, 1938. It was rented to Maritime in November and December, and subsequently until May 1, 1939, was occupied rent free by Maritime in consideration of the latter's vacating tank 155 for Asiatic. It remained fully rented through April 30, 1942.

Tank 156 became available for storage on September 1, 1938, and was rented until January 1939. From then until July 1939, it was unavailable for storage due to the freezeup of the bunker oil. It remained vacant until September 7, 1939, when it was rented to Shell. Tank 156 was fully rented from that time through April 30, 1942.

Tank 2 became available for storage on September 1, 1938. It was continuously rented from that time until May 1939. It then remained vacant until September 7, 1939, when it was leased to Shell along with tanks 155 and 156 in a "package deal." Tank 2 was fully rented from that time through April 30, 1942.

Tank 304 became available for storage on August 28, 1940. It was immediately leased to the First National Oil Corporation and remained fully rented through April 30, 1942.

Tank 3 became available for storage on June 15, 1941. It was immediately leased to Maritime and remained fully rented through April 30, 1942.

Tank 4 became available for storage on August 28, 1941. It was immediately leased to Maritime and remained fully rented through April 30, 1942.

On May 7, 1941, tank 5 was rented "when completed" to the First National Oil Corporation. Construction of that tank had not yet begun at that time.

Tankport's first lease of tankage to the First National Oil Corporation commenced June 1, 1940.

From 1930 until 1940 there was an expansion of the domestic consumption of fuel oil. The demand for kerosene and petroleum distillates was occasioned by the increased use of these fuel oils for heating homes and other buildings. As the consumption of fuel oil increased there was a requirement for additional storage. Companies dealing

in fuel oil arranged storage facilities at points of consumption so that fuel oil could be moved from refining centers as it became available.

The New York Harbor terminals supply fuel oil for most of New York, the northern half of New Jersey, the western three-fourths of Connecticut, and parts of Pennsylvania, Massachusetts, New Hampshire, and Vermont. The New York Harbor wholesale petroleum market has two functions. It receives crude and refined petroleums from other refining districts, and it manufactures and ships this petroleum to independent and major oil company barge terminals located in the areas of consumption.

The following table shows sales of all grades of fuel oil in those States which constitute the principal area served by the New York Harbor:

TOTAL SALES OF FUEL OIL—ALL GRADES

(Thousands of barrels)

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Connecticut | 7,047 | 7,822 | 7,482 | 9,064 |
| New York | 42,215 | 43,428 | 43,389 | 48,154 |
| New Jersey | 41,458 | 44,232 | 42,862 | 48,087 |
| Total | 90,720 | 95,482 | 93,733 | 105,305 |

The peak demands for fuel oil are during the first and fourth quarters of the year. The second and third quarters of the year are periods of accumulation. It is not economical for tankers to bring in a sufficient quantity of oil during the peak demand winter season; thus a supply must be stored during the summer months to meet the demand during the winter.

The heating oil season is from June to June, July to July, or August to August. Long-term contracts for the storage of fuel oil are usually based on the heating oil season.

During the base period the major oil companies located in the New York Harbor area supplied about 75 per cent of the fuel oil consumed in that area. The remaining 25 per cent was supplied by the independent oil companies.

The major oil companies, through their sales organizations, sold about one-fourth of their fuel oil directly to the consumer. The rest of it they sold to the independent oil companies or to distributors who in turn sold to consumers or small dealers who deliver oil to home-owners. The independent oil companies sold their fuel oil to distributors. The large distributors have their own terminals, called barge terminals, located on inland waterways. Barge terminals are much smaller than ocean terminals.

In 1938 the major oil companies started to change their method of operations. Prior to that time the fuel oil which they sold to inde-

pendent oil companies was sold at prices less than the posted barge prices thus enabling the independents to make a profit on resale to the distributors. In 1938 the major oil companies stopped selling oil at a differential under the posted barge price to the independent oil companies. This forced the independent oil companies to buy oil in cargo lots which they would store in their own or public terminals and then sell by the barge to distributors. One advantage of storing oil in a public terminal was that the terminal would issue negotiable warehouse receipts which the independent oil company could use in financing its operations.

During the base period years there were 14 deepwater ocean terminals in the New York Harbor area, including Tankport, where petroleum products were received from tankers and stored. The largest of these were owned by the major oil companies and were used by them in connection with their own businesses. Only one of these terminals, other than Tankport, was a wholly public storage terminal. This was the General American terminal at Carteret, New Jersey. General American purchased its facilities from Amsco and the latter was its principal tenant throughout the base period years.

In 1937 General American purchased a 7-acre tract of land adjoining the original 40 acres of land that it had acquired from Amsco for the purpose of expansion in the future. In 1939 it constructed 8 tanks, each having a capacity of 10,000 barrels. These were rented several months after completion. In 1940 it erected 4 more tanks with a capacity of 10,000 barrels each; and in 1942, 3 tanks with a capacity of 96,000 barrels each were constructed. The 3 latter tanks were built as a result of the pressures of the war effort.

Except for the eight 10,000-barrel tanks erected in 1939, General American's large storage tanks were at all times between 1934 and 1939 fully rented, and its smaller tanks, used for specialties, were leased 85 to 90 per cent of the time. However, the renters did not utilize all of the space that they rented.

The Royal Petroleum Corporation (hereafter referred to as Royal) operated a terminal at Sewaren, New Jersey, primarily for the selling operation of petroleum. From time to time it leased unused tankage for public storage of petroleum products. The amount of space Royal leased for public storage depended upon how much space it would require for its own business from year to year. It would only lease surplus space. Royal increased its storage capacity from 245,000 barrels at January 1, 1936, to 842,190 barrels at December 31, 1939.

Tankport's excess profits net income computed under the invested capital credit method for each of the years ended April 30, 1944, 1945, and 1946, was $74,227.73, $124,284.50, and $50,558.97, respectively.

Tankport's excess profits credits computed under the income method for the years ended April 30, 1944, 1945, and 1946, are as follows:

| Year ended April 30 | Excess profits net income |
|---|---|
| 1937 | [1] $22, 119. 90 |
| 1938 | [1] 10, 479. 20 |
| 1939 | 6, 987. 40 |
| 1940 | 14, 396. 84 |
| Aggregate | $53, 983. 34 |
| Increase in lowest year per section 713 (e) | 4, 761. 58 |
| Total | 58, 744. 92 |
| Average under section 713 (e) | 14, 686. 23 |
| 95 per cent of average of $14,686. 23 | 13, 951. 92 |
| Add: 8 per cent of net capital addition | 864. 00 |
| Excess profits credit—income method | 14, 815. 92 |

[1] Constructive amounts computed under 713 (d) (2).

Tankport's excess profits credits computed under the invested capital method for the taxable years ended April 30, 1944, 1945, and 1946, are as follows:

| | April 30 | | |
|---|---|---|---|
| | 1944 | 1945 | 1946 |
| Money paid in for stock | $170, 000. 00 | $170, 000. 00 | $170, 000. 00 |
| 25 per cent of new capital paid in | 1, 000. 00 | 1, 000. 00 | 1, 000. 00 |
| Accumulated earnings and profits | 43, 150. 41 | 57, 515. 11 | 77, 802. 64 |
| Average equity invested capital | 214, 150. 41 | 228, 515. 11 | 248, 802. 64 |
| 50 per cent of average borrowed capital | 77, 942. 08 | 69, 906. 49 | 64, 869. 86 |
| Invested capital | 292, 092. 49 | 298, 421. 60 | 313, 672. 50 |
| Excess profits credit at 8 per cent of invested capital | 23, 367. 40 | 23, 873. 73 | 25, 093. 80 |

Tankport is entitled to compute its excess profits credit under section 713.

Tankport's excess profits tax for the fiscal years ended April 30, 1944, 1945, and 1946, computed without the benefit of section 722, results in an excessive and discriminatory tax.

Had Tankport begun business 2 years before it did so it would have had a capacity of not more than 420,000 barrels at the end of its base period and it would have been able to rent an average of approximately 350,000 barrels of its capacity throughout its last base period year.

Had Tankport begun business 2 years before it did so, its net income for the fiscal year ended April 30, 1940, would have been $47,000.

A fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of computing Tankport's excess profits credit for the fiscal years ended April 30, 1944, 1945, and 1946, is $43,000.

Some of the facts and exhibits thereto are stipulated. They are found as stipulated and are incorporated herein by reference.

## OPINION.

The issue for decision in this case is whether the Commissioner erred in disallowing Tankport's application for excess profits tax relief under section 722 (b) (4).

To qualify for relief under section 722 the petitioner must establish that Tankport's excess profits tax computed without the benefit of section 722 is excessive and discriminatory and further must establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. *East Texas Motor Freight Lines*, 7 T. C. 579 (1946).

Insofar as this case is concerned, section 722 (b) (4) provides that a taxpayer's excess profits taxes for the years in issue will be considered excessive and discriminatory if the taxpayer shows that its average base period net income is an inadequate standard of normal earnings because it commenced business or changed the character of its business during the base period and its average base period net income does not reflect the normal operation for the entire base period of the business. A difference in capacity for production or operation is considered to be a change in the character of the business. If such a change was made in a taxable year ending subsequent to December 31, 1939, but was the result of a course of action to which the taxpayer was committed prior to January 1, 1940, it is deemed to be a change on December 31, 1939. Section 722 (b) (4) further provides that if the taxpayer's business did not reach by the end of the base period the earning level it would have reached if the taxpayer had commenced business or made the change in character 2 years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. The Commissioner concedes that Tankport commenced business during the base period.

The petitioner contends that under normal conditions, if Tankport had commenced business 2 years earlier than it did, it would have acquired a storage capacity of at least 500,000 barrels by December 31, 1939, which it would have fully rented throughout the base period because of the unsatisfied demand for storage capacity for fuel oil in the New York Harbor area during that period. The petitioner argues

that any vacancies which actually occurred in Tankport's base period were due to the fact that it was commencing business and was still under construction, and to unusual and temporary vacancies which would not have arisen had it commenced business 2 years earlier and been operating under normal conditions.

We have carefully considered the voluminous evidence introduced to show the demand for storage space for fuel oil in the New York Harbor area during the base period years. There can be no doubt that there was a growing demand for storage space of fuel oil and other petroleum products throughout the base period years. However, this alone does not mean that Tankport could have fully rented the 500,000 barrel capacity it allegedly would have had had it begun business 2 years before it did so. We must take cognizance of the fact that the major oil companies stored most of their own petroleum products, and some of the independent oil companies, such as Royal, constantly increased their storage capacities rather than rent additional space from public terminals. Also it is unlikely that the First National Oil Corporation, one of Tankport's principal customers, would have rented any space from Tankport during the base period years since it was not until late 1939 that it negotiated with the Mexican Government for shipping oil to the New York Harbor area.

After careful analysis of the entire record, it is our judgment that had Tankport begun business 2 years before it did so it would have had a capacity of not more than 420,000 barrels at the end of its base period and, further, that it would have been able to rent an average of approximately 350,000 barrels of its capacity throughout its last base period year. Based upon these findings we have determined a constructive net income for Tankport's fiscal year ended April 30, 1940, in the amount of $47,000 which we have backcast in order to adjust for variations in Tankport's constructive earnings throughout the base period years. See *Midvale Co.*, 19 T. C. 1216 (1953), and E. P. C. 8, 1947–1 C. B. 73. Tankport's constructive average base period net income as thus determined is $43,000.

In view of our above findings, it is unnecessary for us to determine whether Tankport was committed prior to January 1, 1940, to a change in the capacity of its business since we have found that it would have been able to rent only an average of approximately 350,000 barrels of its capacity throughout its last base period year even though its terminal capacity would have been considerably larger than that.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*